# A. R. FULLER v. BUDD M. ROBINSON, Appellant.

### Division Two, July 19, 1910.

1. **ALIENATING WIFE'S AFFECTIONS: Statements by Plaintiff to Wife: Hearsay: Exception.** Statements made by the husband to his wife's mother, in her presence, and in the absence of the defendant, in the suit for alienating her affections, in explanation of her going away upon a visit from which she did not return, are admissible in evidence for the purpose of showing the state of her affections and her motive for taking the trip. Such testimony is an exception to the general hearsay rule.

2. **———: ———: ———: After Rupture: Collusion.** And although said statements were made a day or two after a rupture between plaintiff and his wife had occurred, they were not inadmissible on the ground that the alienation was already an accomplished fact, since the facts show the alienation was not then complete, but that her going away was in friendliness and for the purpose of getting her out from under defendant's influence, and that he thereafter industriously pursued her at the place to which she had gone, with his attentions and affections, and not till then did she announce her unwillingness to live with plaintiff. Nor do they indicate that her going away was the result of a collusion between plaintiff and his wife.

3. **———: Departure: Purchasing Return Ticket.** As bearing on the state of his wife's affections for plaintiff and as tending to show that a permanent separation was not contemplated, testimony by him that he purchased for her a round-trip ticket when she went away on the trip from which she never returned, is competent in his suit against defendant for alienating her affections, although, because of his objection to her competency to testify, she was not permitted to contradict him or to give her explanation of the matter.

4. **———: Offer to Withdraw Testimony.** Any error, in the respondent's suit for the alienation of his wife's affections, committed in the admission of testimony in his behalf to the effect that defendant's wife went to plaintiff's house and found his wife and defendant there together and defendant's horse hitched in the alley, and when the three of them came out on the porch defendant's wife seemed to be very nervous, while the other two were composed, even if it be conceded that technical error was committed in admitting it, was cured by respondent's request to withdraw it and by his request of an instruction to the jury to

disregard it, though such instruction was refused—because it is apparent the jury would have found the same verdict had not the testimony been admitted.

5. ———: **Visits of Defendant's Wife to Plaintiff's.** In the suit by a husband against another for alienating his wife's affections, where it is shown that up to a certain time their wives were on friendly and intimate terms of association, it is competent to show that, after defendant's marked conduct in visiting the plaintiff's wife at her house in his absence had attracted the attention of the neighbors, defendant's wife ceased her visits to plaintiff's wife.

6. ———: **Excessive Verdict.** A verdict for $10,000 in a suit for alienating the affections of plaintiff's wife, is not excessive. There is no scale by which damages can be graduated with certainty in such cases, and the law commits to the jury the duty of estimating the wrong done the plaintiff, and with their discretion the court will not interfere except where they have clearly been actuated by unreasoning passion or prejudice.

7. ———: **Members of Same Fraternity.** It is not error to permit plaintiff to show that he and defendant were members of the same fraternal order—in the suit for the alienation of his wife's affections.

8. ———: **Photographs of Signatures.** Photographs of pages of a hotel register which cannot be produced in court because the hotel is located in another State, on which were the names of defendant and plaintiff's wife, are competent evidence, in connection with plaintiff's testimony that their names thereon were accurate reproductions of their signatures.

9. ———: ———: **Harmless Error Cured by Deposition.** And even were there error in admitting such photographs in evidence, it was harmless, since the only purpose of introducing them was to show that defendant and plaintiff's wife were registered at certain hotels in Chicago at certain times, and those things were expressly testified by him in two depositions introduced in evidence.

Appeal from Barton Circuit Court.—*Hon. James B. Johnson,* Judge.

AFFIRMED.

*A. E. Spencer* for appellant.

(1) The court erred in permitting plaintiff, over the objection of the defendant, to testify to his con-

versation with his wife in the absence of the defendant. As to defendant, such conversation was clearly hearsay, and the evidence was highly prejudicial in character. Leavell v. Leavell, 122 Mo. App. 654; Westlake v. Westlake, 34 Ohio St. 621; Buchanan v. Foster, 48 N. Y. Supp. 732; Rice v. Rice, 62 N. W. (Mich.) 833. (2) Plaintiff was also improperly permitted to testify that when his wife left him, he purchased her a round-trip ticket, at her request. See authorities cited under point one. (3) Error again occurred in permitting a witness for plaintiff to testify to the actions of defendant's wife in watching both defendant and the house of plaintiff. The plaintiff saw and confessed the error in this, but the court adhered to his original ruling, and let such evidence be considered by the jury. No withdrawal of the evidence could have cured the plain error in its admission. And withdrawal was not attempted until two days later. Meyer v. Lewis, 43 Mo. App. 420; Mueller v. Weitz, 56 Mo. App. 40; Wojtylak v. Coal Co., 188 Mo. 285; Stephens v. Railroad, 96 Mo. 214; Naughton v. Gaslight Co., 123 Mo. App. 204. (4) The same form of error occurred in permitting evidence that, at a certain time, the defendant's wife ceased visiting at plaintiff's house. This was clearly incompetent as against defendant, and could only operate to prejudice him before the jury. The conduct of defendant's wife was no more proper than her declarations. (5) The damages in this case were excessive, and manifestly the result of the passion and prejudice of the jury. The verdict was for $15,000, reduced by the court to $10,000. Under the pleadings, compensatory damages alone could be awarded, and punitive damages were excluded. The evidence does not warrant a judgment for $10,000. R. S. 1899, secs. 594 and 595; Hartpence v. Rogers, 143 Mo. 623; Nichols v. Nichols, 147 Mo. 387. (6) The court erred in refusing to instruct the jury, at request of defendant, that if plaintiff en-

couraged, consented to, or connived at, the association of his wife with defendant, and because of such association, and without the defendant so intending, the wife lost her affection for the plaintiff, the verdict should be for defendant. And also that if plaintiff encouraged his wife in attentions to defendant, or connived thereat, and by reason of such attentions to defendant she became estranged from plaintiff, without any wrongful influence on the part of defendant, the verdict should be for defendant. Childs v. Muckler, 105 Ia. 279; Tasker v. Stanley, 153 Mass. 148; Modisett v. McPike, 74 Mo. 636; Hartpence v. Rogers, 143 Mo. 623; 21 Cyc. 1621, 1619. (7) The closing argument for plaintiff was bitter and full of error. Counsel appealed to the passions of the jury, and went outside the evidence. He accused defendant of deserting his wife and besought the jury to punish the defendant. The action of the court did not cure this. The situation called for prompt and vigorous action by the court, and it was not forthcoming. Beck v. Railroad, 129 Mo. App. 7; Bishop v. Hunt, 24 Mo. App. 373; Fathman v. Tumilty, 34 Mo. App. 236; Nichols v. Metzger, 43 Mo. App. 607. (8) The court erred in permitting plaintiff to examine photographs of certain signatures, and from such examination to testify to the handwriting. Taylor's Will, 10 Abb. Pr. (N. S.) 318; Hynes v. McDermott, 82 N. Y. 51; Maclean v. Scripps, 52 Mich. 214; Geer v. Company, 134 Mo. 85; Houston v. Blythe, 60 Tex. 506; Tome v. Railroad, 39 Md. 36. (9) Defendant's witness, Mrs. Brannon, testified to quarrels between plaintiff and his wife. Such evidence was proper, but the court struck same out on motion of the plaintiff. Fratini v. Caslani, 66 Vt. 273.

*Thurman & Timmonds, Cole, Burnett & Moore, McAntire & Scott* and *P. D. Decker* for respondent.

(1)    Appellant contends that the court erred in admitting a conversation between plaintiff's wife and himself.    This conversation was had in the presence of Mrs. Brannon.    It occurred the morning following defendant's midnight buggy ride with plaintiff's wife. It contained no reference to any words, acts or conduct of defendant.    It only indicated the state of the wife's feelings for plaintiff and defendant, and her motive and reason for going away.    This is not hearsay but original evidence.    It was admissible under the exception to the hearsay rule for the purpose of showing the feelings or mental condition of plaintiff's wife and her reason and motive for leaving.    State v. Wooley, 215 Mo. 686; Reed v. Reed, 101 Mo. App. 176; Mead v. Arnold, 131 Mo. App. 223; Folks v. Burnett, 47 Mo. App. 566; Lyon v. Prouty, 154 Mass. 490; Ash v. Prunier, 105 Fed. 724; Perry v. Lovejoy, 49 Mich. 529; McKenzie v. Lautenschlager, 71 N. W. (Mich.) 489; Edgell v. Francis, 33 N. W. (Mich.) 501; Preston v. Bowers, 13 Ohio St. 1; Rose v. Mitchell, 43 Atl. (R. I.) 68; Jacobs v. Whitcomb, 64 Mass. 257; Lockwood v. Lockwood, 70 N. W. (Minn.) 789; Rosener v. Darrah, 70 Pac. (Kan.) 597; Puth v. Zinbleman, 68 N. W. (Ia.), 897; Hardwick v. Hardwick, 106 N. W. (Ia.) 639; Sexton v. Sexton, 105 N. W. (Ia.) 315; Williams v. Williams, 37 Pac. (Colo.) 616; Beach v. Brown, 55 Pac. (Wash.) 47; Tucker v. Tucker, 32 L. R. A. (Miss.) 623; Rudd v. Rounds, 64 Vt. 432; Wigmore, sec. 1730. (2)    This testimony simply showed that at the time his wife left, she requested a round-trip ticket and that in pursuance of that request plaintiff purchased the same for her.    The expression of the request was explanatory of the act done in pursuance of the request. Moreover, the intention or motive of the wife in going, what was in her mind at that time, could be shown by

her declarations preceding the doing of the thing. Her request for a round-trip ticket was a verbal act evidencing her intention to return. The court did not err in admitting this evidence. Mead v. Arnold, 131 Mo. App. 223; Folks v. Burnett, 47 Mo. App. 566; Perry v. Lovejoy, 14 N. W. (Mich.) 486; McKenzie v. Lautenschlager, 71 N. W. (Mich.) 489; Glass v. Bennett, 14 S. W. (Tenn.) 1085; Nevins v. Nevins, 75 Pac. (Kas.) 492; Bailey v. Bailey, 94 Ia. 598. (3) The court did not err in permitting a witness for plaintiff to testify to the actions of defendant's wife when she visited plaintiff's home and found her husband, the defendant, there with plaintiff's wife. This evidence was material and competent to show "whether the conduct of defendant was actuated by good or selfish and improper motives," and as showing under what circumstances and conditions he was associating with and visiting plaintiff's wife. Conceding that the admission of this evidence was erroneous, the withdrawal of the evidence and an instruction to the jury to disregard it would have cured the error of its admission. Modisette v. McPike, 74 Mo. 648; Link v. Vorhauer, 104 Mo. App. 368; Anderson v. Railroad, 161 Mo. 419; Harrison v. K. C. Co., 195 Mo. 634; Stavinaw v. Ins. Co., 43 Mo. App. 517; McGinnis v. Loring, 126 Mo. 405; Frick v. Kansas City, 117 Mo. App. 488; Scharff v. Construction Co., 115 Mo. App. 170; Nevins v. Nevins, 75 Pac. (Kas.) 492; Childs v. Muckler, 75 N. W. (Ia.) 100. (4) The fact that defendant's wife had frequently visited plaintiff's home was a circumstance explaining defendant's visits, and the fact that at a certain time defendant's wife ceased to visit plaintiff's home was a circumstance for the jury to consider in connection with the fact that defendant continued his visits to plaintiff's home, although plaintiff and his wife also ceased their visits to defendant's home. See cases under 3. (5) The courts have repeatedly held that the amount of dam-

ages in such cases as this is considered a question peculiarly within the province of the jury, and that in such cases there is no scale whereby the damages can be graduated with certainty. To the jury as a sacred tribunal has been entrusted the duty and right to weigh the sense of grief, humiliation and wrong of plaintiff and the injury to his feelings, character and condition. Hartpence v. Rogers, 143 Mo. 638; Love v. Love, 98 Mo. App. 572; Minter v. Bradstreet Co., 174 Mo. 504; Woodson v. Scott, 20 Mo. 272; Sutherland on Damages (3 Ed.), sec. 1285 and note 4; Cooley on Torts, sec. 224; Speck v. Gray, 45 Pac. 143; Leavell v. Leavell, 114 Mo. App. 33. (6) The court did not err in permitting plaintiff to identify certain photographs of signatures as the signatures of defendant and of plaintiff's wife. The plaintiff produced the best evidence procurable under the circumstances. If the admission of this testimony was error it was harmless. The identification of these photographs of signatures only went to prove that Alice M. Fuller and Budd M. Robinson were registered at certain hotels in the city of Chicago, which fact was expressly admitted by defendant in two depositions, and hence the proof of the signatures, if error, could have done no harm. Wright v. Railroad, 118 Mo. App. 397; Briggs v. Henderson, 49 Mo. 534. Whether a photograph of handwriting may be used, depends chiefly upon the principle requiring production of the original of a writing. If the original is not obtainable, then a photographic copy may be used. 1 Wigmore on Evidence (1 Ed.), sec. 797; Howard v. Russel, 12 S. W. 527; In re McClellan's Estate, 107 N. W. (S. D.) 685. Where an instrument in writing is neither within the jurisdiction of the court nor within the control of either of the parties to the suit, secondary evidence of its contents is admissible. Lumber Co. v. Herriman Co., 39 Mo. App. 220; Wright v. Railroad, 118 Mo. App. 397.

GANTT, P. J.—This is an action commenced in the circuit court of Jasper county by the plaintiff against the defendant for $25,000 damages for alienating the affections of the plaintiff's wife, causing her to abandon plaintiff and live and remain separate and apart from him.

The cause was tried in September, 1906, in the circuit court of Barton county, to which a change of venue had been taken on the application of the defendant.

In substance the petition charged that the defendant had willfully and intentionally alienated the affections of plaintiff's wife and had wrongfully and wickedly, enticed, influenced, induced and caused plaintiff's wife to abandon plaintiff and live separate and apart from plaintiff, and had thereby permanently deprived plaintiff of the companionship, comfort, enjoyment, aid, support, society and affection of his wife; that plaintiff's wife being induced, enticed, influenced and caused by getting under the influence of the defendant, who was a financially rich and powerful man in the community, has ever since remained away and apart from plaintiff and by reason thereof the plaintiff has been damaged in the sum of $25,000, for which he prays judgment.

The defendant's answer was a general denial.

The testimony on the part of the plaintiff tended to prove that at the time of the trial, plaintiff was thirty-two years old and his wife thirty-one. They had been married ten years. On going to Joplin with his wife in 1901, plaintiff became employed as an accountant of the Joplin Supply Company, a concern which furnished machinery and general supplies for mining operation. Plaintiff was an industrious, hardworking man and faithful to his employers, and while not averse to society and social enjoyment, realized that in his financial circumstances he could not devote too much of his time in that way. Plaintiff's daily

routine of labor was to go to the office of his employer between 7 and 7:30 a. m. and home to lunch from 11:30 to 12 a. m. He took his evening meal about 5:30 and returned to the office at 6:30 and remained until the closing, which was generally about 9 o'clock.

He testified that he worked steadily, never had a day off except one week each year for a vacation, and never took the full week at that. He had never been sick to any extent during his employment. His wife was a woman of attractive appearance, slender, with black eyes and black hair, pretty, intelligent and vivacious, sociable and fond of society. She was very fond of dancing, and desired to go oftener than plaintiff felt he could and do justice to his work. While this caused a difference of opinion between them it did not result in domestic friction. On this point he testified: "We never had any quarrels, we had differences of opinion about going some, she wanted to go to all the dances, I could not go to all as I worked from seven in the morning until nine in the evening every day, and going to the dances kept me up too late, I could not work, I noticed it in my office work; to be out to a dance to one or two o'clock in the morning, I would not get the sleep or rest that was necessary for a man who does office work, and I was no good at my work after I went to a dance. I usually like to go to shows because they would not keep me up until only about eleven o'clock and I managed to get a pretty good rest." According to his testimony and that of his servant, the domestic relations between the plaintiff and his wife were very pleasant.

Plaintiff first met the defendant Robinson in the early part of the year 1902. The defendant was a mine-promoter and a mine-owner and operated several mines. He was also interested in the organization of pipe-line companies for the piping of oil from Kansas. Plaintiff had bought a home in Joplin, a small five-room cottage, with a pretty porch and four or five

large trees in front of it. This home was about three blocks distant from the defendant's home. About six months after the plaintiff first met the defendant, defendant became a visitor at plaintiff's house. Defendant was a married man over thirty-five years of age, and had a wife and a son eight or nine years old, and his wife's mother resided with them. Plaintiff's family consisted of himself, his wife and her mother, who resided with them about half of the time. The families visited back and forth for a time, but about December, 1904, Mrs. Robinson, the defendant's wife, ceased her visits to the plaintiff's wife. After she ceased visiting the plaintiff's family, the plaintiff and his wife ceased to visit at defendant's home, but the defendant continued to visit plaintiff's home. During the early part of their association, plaintiff was in the employ of the Joplin Supply Company and continued therein until June, 1903, at which time the defendant, Robinson, employed the plaintiff as his private secretary, at the defendant's own solicitation. Plaintiff acted as private secretary for defendant about one year and then went back to the Joplin Supply Company as head office man and continued in that position up to and at the time of the trial.

The evidence tended to show plaintiff's daily routine kept him confined to his business and that defendant, knowing of plaintiff's habits, adjusted his visits to plaintiff's home during plaintiff's business hours. This course of conduct had continued over a year prior to the abandonment of plaintiff by his wife. Defendant's conduct was such as to invite and compel comment in the neighborhood of the plaintiff's residence. Neighbors testified that nearly every day about nine o'clock in the morning, or an hour or so after plaintiff had left his home for his office, the defendant arrived at the Fuller home and stayed there until a short time before plaintiff came home to his lunch. And in the afternoon defendant would appear again and

usually stay until about five o'clock, when he would leave before plaintiff returned to his evening meal. Defendant often took plaintiff's wife out horseback riding.

Late in the year 1904 the defendant organized a party to attend the World's Fair at St. Louis. His wife was to be a member of the party. She went a day or two in advance and occupied apartments which had been secured for her and her son, downstairs. The defendant, Mrs. Fuller and the others took apartments in the same building upstairs. The apartment taken by the defendant and his friends upstairs consisted of one room with a cloth curtain separating the beds. The evidence shows that the defendant on this World's Fair trip and while the plaintiff was in Joplin, took plaintiff's wife away from the company for a whole day. It was after this episode that defendant's wife ceased her visits to plaintiff's home.

The evidence tended to show that the plaintiff was wholly ignorant of the fact that the defendant was coming daily to his house while he was absent at his work.

There had been some annoyance of plaintiff arising out of the defendant's pronounced attention to his wife at a Colonial Fair conducted by the Elks about the first of March, 1905. Defendant's attentions were such as to cause general comment and the witnesses testified that the defendant and plaintiff's wife spent nearly every evening dancing together. They would commence at the start and dance through to the finish. Plaintiff who was in charge of a booth in another part of the room, did not know of these attentions until he overheard a remark and he told the defendant about it. He said, ''You are a friend of mine, I trust you fully. I trust you as a brother, I just want to tell you what I accidentally overheard.'' Defendant said: ''People would talk whether he danced with Mrs. Fuller or not, that it did not make a bit of difference,

people talked anyway." To which plaintiff replied: "I do not care about my wife being talked about, and it is best for you to cut it out."

Neither did plaintiff know of the visits of the defendant to his home except once or twice a week when defendant would see plaintiff in the evening and walk home with him and on Sundays when he would be invited there to dinner.

It seems the first plaintiff ever knew of defendant's calling on his wife in his absence was on Friday night in June, 1905, when defendant went by the office where plaintiff was at his work and inquired if he was going to the Elks' Lodge that evening. The plaintiff told him he was. Thereupon defendant said, "I will see you there, I have a book I want your wife to read, I will walk up with you after lodge." To which plaintiff assented. Plaintiff attended the lodge that evening about 8:30 p. m., and not finding the defendant there, concluded to go home. He detailed what happened on his arrival at home as follows: "I went up to the house and found him there sitting in a chair reading out of this book aloud to her, and she was sitting on the arm of the chair, and I made the remark, 'You keep your dates well.' I was pretty warm under the collar. He had made the agreement to meet me at the lodge and had failed to do so. She was sitting on the arm of the chair, she had her arm around the back of his chair listening to him read aloud to her."

On the succeeding Saturday night the plaintiff and his wife, in the presence of her mother, discussed defendant's attentions to her, and plaintiff told her that these visits should cease, to which the mother agreed. But the plaintiff's wife did not agree to this, but thought that defendant ought to be welcome at any time. On the next day plaintiff and his wife had walked down town after the mail and met the defendant and he proposed to them to take a ride, which plaintiff

declined to do, in an abrupt manner. Plaintiff and his wife went home and sat on the porch until it was dark, when plaintiff went in the house, and when he came back on the porch, his wife was gone; he inquired of her mother about her and was told that she had gone riding with the defendant. Plaintiff sat on the porch and smoked until 11:30 when they returned, when he stepped to the buggy and helped his wife out and told her to go into the house, that he wanted to speak to defendant. He then told the defendant that the latter had a. wife and child of his own and had no business up there when he knew it was against his wishes and that he must stay away from there absolutely in the future. Defendant said, "Get into the buggy, I want to talk with you." To which plaintiff replied, "There is no talk coming from you at all. You stay away from here." After this rupture between the plaintiff and the defendant, plaintiff arranged for his wife to go east to visit some relatives, in order that she could get from under the defendant's influence. He bought her a round-trip ticket to Toledo, Ohio, and back to Joplin. He took her to the train and stayed with her until the train started and bade her good-bye in the usual manner. She corresponded regularly with her husband from the time she left, which was about July first, until August, 1905. The last letter she ever wrote plaintiff was from Chicago, Illinois, dated August 11, 1905, as follows: "Dear Roy: Your letter received this morning and it has pretty near killed me, but I can't come and live with you and like another and you would not want it. It has pretty near killed me for about a year now until it seems as though I don't care what happens. I have done everything and like you just as I always did, but I can't live with you even if I can't have the other. I realize how terrible it is and you have always been so good to me. If I could come back you would not need to change, as you are all right as you are. It is myself and I can't help it.

I have tried to be as honorable as possible in a dishonorable affair and have always had such high ideas of honor, why should such a trouble come to me and it is certainly killing me, as I fully realize the hurt to all, what it has been and what it is to be, but cannot change. If I would die it would be such an easy way. I came to Chicago and wired Budd and he sent for Edith and she is here and is going to stay with me until mamma comes if she wants to. You have certainly done your part and it is all my fault. You know I am not young or easily influenced, in fact, more liable to influence others. You would not want me feeling as I do and Budd has certainly been as honorable as could be possible in such a case. It kills me to hurt you, but think of me and you have not realized how much I have suffered and I expect blame and trouble always, though I know I deserve it. ALICE."

Plaintiff's wife never returned to him. It developed that in spite of the fact that plaintiff had forbidden defendant to come to his house, defendant continued to communicate with her by telephone and by personal visits. That he saw her on the day she left for Ohio; that he corresponded with her while she was gone; that he followed her to Toledo, where he spent two days with her, and while there arranged to meet her in Chicago. On the night of August 2, 1905, defendant while in Joplin received from plaintiff's wife a telegram as follows: "Chicago, Ills. 2, Budd M. Robinson, Joplin, Mo. Needed to close deal. Address you said. Wire to-night. Come. GEORGE." In the deposition of the defendant taken by the plaintiff, defendant testified that he went to Chicago in response to this telegram. He knew it was from Mrs. Fuller. He testified that he did not leave Joplin for Chicago until at least two days, possibly three, after he received it. On August 4th at 8:37 a. m. he wired from St. Louis: "Mrs. Alice M. Fuller, Stratford Hotel, Chicago. Shall arrive on Alton at five o'clock.

Budd.'' He arrived in Chicago about 4:30 p. m. and went directly to the Stratford Hotel. He testified that when he found that Mrs. Fuller was at the Stratford, he immediately changed hotels, that is, the next day or the day afterwards, but the record shows that he and Mrs. Fuller checked out at the same time, Sunday, August 6, 1905, after supper. He testified the reason she left that hotel was because she was dissatisfied with it, but his own reason for leaving was that he did not want to stay in Chicago at the same hotel Mrs. Fuller was in; that she told him she was going to the Great Northern, and he told her he was going to the Windsor Clifton, and that he saw her at the Great Northern both during the day and the evening. Although Mrs. Fuller left the Stratford on August 6th after supper, she did not arrive at the Great Northern until August the 8th. Miss Edith Smith, who went to Chicago for the purpose of being a lady companion to Mrs. Fuller, testifies as to their staying part of the time at a rooming house. The record shows that Mrs. Fuller left the Great Northern August 13, 1905, and shortly afterwards went to Galena, Kansas, and defendant visited her there until she went away to the west. Defendant in his deposition taken in this suit stated that his purpose in going to Chicago on the telegram signed ''George,'' was to induce her to return to her husband, but in his deposition taken by the plaintiff in the divorce suit he testified that he went to Chicago in response to that telegram to advise and assist plaintiff's wife to a permanent location in Chicago; that his visit to her in Toledo was not on any business matter, but was simply a social visit. Before leaving for the west, plaintiff's wife instituted a divorce suit in the Jasper Circuit Court against the plaintiff, upon the ground that he had made the statements contained in his petition in this suit against her, and Robinson, the defendant, which statements she alleged were false. The defendant

testified in his deposition that he had discussed with
her the bringing of the divorce suit before she return-
ed to Galena, Kansas, from Chicago, as well as after-
wards. He testified he told her there was no question
but what the statements were absolutely false. Defend-
ant continued to aid and assist Mrs. Fuller in separat-
ing from her husband, accompanied her at the trial
of the divorce suit and occupied a chair by her side,
and took her to the hotel after the case was decided.

The defendant did not take the witness stand in
this case. He introduced the depositions of three wit-
nesses taken by the plaintiff, which contained no testi-
mony of any benefit to the defendant.

For the defendant on the trial four witnesses
testified orally. His attorney testified that after
plaintiff's attorneys had taken the deposition of a
witness, Miss Edith Smith, on written interrogatories,
at Mattoon, Illinois, they abandoned the taking of de-
positions of some witnesses upon notice. Plaintiff did
not introduce the deposition of this witness on the
trial of this case, but defendant then introduced this
deposition, in which Miss Smith stated that she was
a second cousin of Mrs. Fuller and her feelings were
not particularly friendly to the plaintiff in this suit;
that she went to Chicago in accordance with plans
made by Mrs. Fuller and herself.

W. W. Petraues testified that he saw the defend-
ant dance with his own wife two or three times at
the Elks' fair.

W. H. Frickleton stated that he associated with
the defendant in organizing pipe-line companies for
piping oil from Kansas, and that while he was in Chi-
cago in July the defendant went away for a few days,
and left with him this address, "Budd Robinson,
Toledo, Ohio." That witness was in Chicago again
from August 1 to August 10, 1905, and was at the
Windsor Clifton Hotel, but never saw the defendant
during that time.

Defendant also called one John Seward, who claimed to be a detective, and whose testimony developed that he was endeavoring to obtain money from both sides of this case for services as a detective in procuring witnesses to testify on each side without the knowledge of the other party. It is unnecessary to say more about this witness than that his own letter to the plaintiff stamps him utterly unworthy of credit and his testimony must have been more injurious to the defendant who introduced him as a witness than to the plaintiff.

Mrs. Arthur Bannon, Mrs. Fuller's mother, testified that the plaintiff and his wife quarreled over trivial things, at least the quarrels would commence over trivial things, and actually fight each other; that she could not eat or do anything when she saw them quarreling. On cross-examination she testified that although she knew the attentions of the defendant to her daughter were such as involved her daughter's honor and good name, she never said anything to her daughter about the matter, but confined her complaints to her son-in-law, the plaintiff. During the giving of her testimony, it appears that she fainted in the witness chair. At this juncture, Mrs. Fuller, who was at the trial of the case, exclaimed: "Mother, cheer up, cheer up, it is all right, we do not care. Fight to the finish, we do not care."

It appears from telegrams in evidence that the defendant had Mrs. Fuller come from the State of Colorado to be present at the closing days of the trial and produced her as a witness, but the court held that she was incompetent. As already said the defendant did not offer himself as a witness in the case.

The jury returned a verdict for the plaintiff and assessed his damages at $15,000. On the motion for new trial the circuit court announced that if the plaintiff would enter a *remittitur* of five thousand dollars, the motion for new trial would be overruled, and

thereupon the plaintiff entered a *remittitur* for the amount specified, and the court then overruled the motion for a new trial, and judgment was entered in favor of the plaintiff for the sum of $10,000, and from that judgment the defendant, in due form, has appealed to this court.

I. The defendant assigns as error the action of the circuit court in admitting a conversation between the plaintiff's wife and himself in the presence of Mrs. Bannon, his wife's mother, on the morning following the defendant's buggy ride with the plaintiff's wife in June, 1905. It will be noted that this conversation contained no reference to any word, act or conduct of the defendant. It was admitted for the sole purpose of showing the state of the affections of the plaintiff's wife and her motive for taking the trip to Toledo, Ohio, at that time. The pith of this objection is that it was a statement made in the absence of defendant and if there was any alienation it had already occurred.

As to the first contention, the rule is stated by Greenleaf on Evidence, section 102, to be: "In actions for criminal conversation, it being material to ascertain upon what terms the husband and wife lived together before the seduction, their language and deportment towards each other, their correspondence together and their conversations and correspondence with third persons, are original evidence." 3 Wigmore on Evidence (1 Ed.), sec. 1730, says: "The existence of an emotion, hatred, malice, affection, fear and the like, is usually evidenced by conduct or by utterances indirectly indicating the feeling that inspires them. But a declaration directly asserting the existence of the emotion is admissible, under the present exception, like a statement of any other kind of mental condition. The uses of such statements to impeach a witness and to prove an accused person's malice fur-

nish the commonest instances of the application of the principle. A special application is also found in actions for alienation of affections, criminal conversation, divorce, or wife murder, where the state of affections of the wife to the husband, or of the husband to the wife, becomes material. Here the declarations of the person as to her or his own state of affections are admissible under the present principle. In most instances such expressions are chiefly useful in an indirect or circumstantial way only; in some instances they merely state reasons for a departure from the home. But in general no discrimination is made on these points; and it is said merely that declarations made at a time when there was no motive to deceive are admissible.'' The text is fully supported by Wright v. Taham, 5 Cl. & F. 683; Gilchrist v. Bale, 8 Watts 356, and Gaines v. Relf, 12 How. (U. S.) 535.

In support of his objection to this testimony, defendant cites Leavell v. Leavell, 122 Mo. App. 654. All that pertains to this point in that case is found in this sentence, in the opinion on page 657: ''There was also some evidence of statements of plaintiff's husband made out of the presence of defendants which we consider to be harmful and reversible error. [Westlake v. Westlake, 34 Oh. St. 634.]''

In Westlake v. Westlake, 34 Oh. St. 634, on the trial, the defendant took a bill of exceptions setting out all the evidence, from which it appears that the plaintiff, against the objection of the defendant, was permitted to prove, by several witnesses, declarations of the husband, made in the absence of the defendant, to the effect that the old man (Joseph, the defendant) was doing all that he could to separate them (husband and wife), to which exceptions were saved, and it was ruled that this was clearly hearsay evidence and should have been rejected.

In Hardwick v. Hardwick, 106 N. W. 640, the plaintiff was allowed to testify to her husband's state-

ment to her that his father, the defendant, wanted him to leave her, and she was allowed to describe his feelings at the time of making this statement. The Supreme Court said: "The nature of this issue is such that it was not only proper to show the declarations and act of defendant in respect to his son's marriage relation, but also to show the effect of these upon the son; that is, the state of the husband's mind towards his wife in consequence of defendant's conduct, and the way in which such conduct caused him to treat his wife. . . . In Westlake v. Westlake, 34 Ohio St. 621, the declaration held to have been improperly admitted was the naked statement to a third party that defendant was doing all he could to separate her from her husband. It was in no way connected with anything indicating his mental attitude, and was clearly hearsay." We might add that this conversation in the last cited case, was plainly not admissible because it was the declaration of a husband as to the acts and conduct of the defendant and was not a declaration tending to show mental condition or the state of the affections of the husband himself.

Defendant also cites Buchanan v. Foster, 48 N. Y. Supp. 732, which was a suit by the wife against another woman for the alienation of the plaintiff's husband's affections. The court said: "A very large part of the evidence as to the quarrels and bickerings of the plaintiff and her husband was entirely irrelevant and not admissible. While it is undoubtedly true that, where an act is proper to be proven as part of the *res gestae,* the declarations accompanying that act may be offered in evidence for the purpose of characterizing the act, even though made in the absence of the defendant, yet such declaration is no proof of the fact declared as against the defendant, independent of competent evidence for its establishment." And in that case, there was no evidence to establish any act or conduct

on the part of the defendant to alienate plaintiff's husband outside of said declarations.

Rice v. Rice, 62 N. W. 833, is also cited by defendant to show that the evidence objected to was improperly admitted in this case. There the court simply announces the general hearsay rule, that conversations between husband and wife in the absence of the defendant are not admissible, but does not pass upon the exception of the rule as to the admissibility of conversations between the husband and wife tending to show mental condition, state of feelings, or motive, because no such question was raised.

We think this evidence was clearly competent under the exception to the hearsay rule for the purpose of showing the feelings or mental condition of plaintiff's wife and her reason and motive for going to Toledo shortly thereafter. [Edgell v. Francis, 33 N. W. (Mich.) 501; Rose v. Mitchell, 43 At. (R. I.) l. c. 68; Preston v. Bowers, 13 Ohio St. 1; Roesner v. Darrah, 70 Pac. (Kas.) 597; Sexton v. Sexton, 105 N. W. (Ia.) 318; Williams v. Williams, 37 Pac. l. c. 616; Ash v. Prunier, 105 Fed. l. c. 724.]

As to the other part of the objection that it was incompetent because the alienation had already occurred, we think it is not tenable, that the evidence tended to show that the alienation had not been consummated at that time, that plaintiff's wife still retained affection for her husband, though as she admits in the conversation, defendant had an influence over her. This evidence tended further to show that she went away to escape the influence of the defendant, but that he persisted in following her up. He corresponded with her; followed her to Toledo, Ohio, and visited her in Chicago. On the other hand plaintiff's wife was corresponding with him (her husband) regularly until August 12th, when she wrote him a letter, set out in full in the statement, after she had been associating with the defendant in Chicago for several

days. There is no testimony whatever in the case from which any presumption of collusion between the plaintiff and his wife could be drawn. On the contrary, her partisanship for the defendant was manifested by the fact that defendant visited her at Galena, Kansas, after her return to Chicago, and she counseled him before leaving Chicago and afterwards as to the bringing of a divorce suit against plaintiff. It also appears that during the trial of her divorce suit, the defendant sat with her, and escorted her to the hotel after the case had been passed upon. In our opinion this evidence does not violate the rule that in actions of this character, conversations with the wife indicative of her feelings towards the defendant in order to be admissible, must have occurred prior to the alleged misconduct on her part, so that there may be no ground for imputing collusion. Any suggestion of collusion in this case, is rebutted by the overwhelming testimony in the case to the contrary. There is not a scintilla of testimony tending to show that the plaintiff in this case was in collusion with his wife to obtain damages from the defendant.

II. It is insisted that the court erred in permitting the plaintiff to prove that he purchased a round-trip ticket from Joplin to Toledo, Ohio, at her request. The effect of this evidence was to show that permanent separation was not contemplated at that time, either by the plaintiff or his wife. If the purchase of this round-trip ticket was not in good faith and in the usual course of business, its impeachment lies wholly in the duplicity and the secret understanding between the defendant and plaintiff's wife. Her request for a round-trip ticket was an *oral act* evincing her intention to return. The testimony of the plaintiff as to the purpose for which he had consented to his wife going to Toledo accords with the presumption that she was still a loyal wife and at the expiration of the time

that she was to be gone she would return to her husband, and nothing was more natural than that he should provide her with transportation to return. Defendant alleges, however, that the wife was not permitted to give her version of her intention at that time, because plaintiff objected to her as a witness. To this the answer is that the plaintiff in objecting to her testimony exercised the right which the law gave him, and the circumstances fully justified him in objecting to her as a witness. When the part she had taken in this whole affair is taken into consideration, together with the fact that she was under the influence of the defendant at the time of the trial, he was fully justified in objecting to her testimony. Defendant complains that by permitting the plaintiff to testify to her statements on the eve of her departure for Toledo, plaintiff was allowed to give his version thereof free from all fear of contradiction as thus she was made in effect a witness for him, and yet her statements under oath were excluded.

In McKenzie v. Lautenschlager, 71 N. W. 489, it was said: "Plaintiff was allowed to introduce in evidence statements made by his wife, not in the presence of defendants, and letters written by her. The wife was afterwards called as a witness by the defendants, and upon objection by the plaintiff, her testimony was excluded. The defendants say this resulted in the plaintiff getting the benefit of admissions and statements made by the wife in his favor, without giving the defendants an opportunity to have the version of the wife, which would have been in their favor, and this was error; citing White v. Ross, 47 Mich. 172. We think the testimony was admissible for the purpose of showing the state of mind of the wife towards the husband. [Perry v. Lovejoy, 49 Mich. 530.]"

In Perry v. Lovejoy, supra, the court said: "At this stage of the trial the plaintiff offered the letter containing indications of the wife's affections and it

Fuller v. Robinson.

was objected to on two grounds: (1) Because the judgment in White v. Ross, 47 Mich. 172, was opposed. to its admission. (2) Because the writer, the plaintiff's wife, was then actually present and might be called at his election to make her statement under the sanction of an oath. The court allowed the letter to come in. In view of the antecedent showing we think this. determination was in accordance with the law of evidence. By the common law the plaintiff's wife was absolutely incompetent. The rule has been so far modified by legislation as to make her competent in case of his consent, and leaving him perfectly free to give or withhold his consent. No fetter is imposed on the discretion so given. He refused and the consequence was that she was just as incompetent as she would have been in case the common law had remained. unaltered. In point of principle therefore the circumstance that she was actually in court and could be made a lawful witness at the plaintiff's own instance was void of influence on the admissibility of the letter. We have seen what was the nature of the evidence which preceded the offer of the letter and the conclusion is unavoidable that there was enough in it to allow the jury to inquire whether the defendant had committed an actionable interference in the plaintiff's family relations. The question was not ruled by White v. Ross, supra, the gist of the action is the plaintiff's loss of his wife's society, services, and comfort by means of the tortious conduct of the defendant (Winsmore v. Greenbank, Willes 577; Bennett v. Smith, 21 Barb. 439; Barnes v. Allen, 1 Keyes 390), and among the questions which pertain. to the issue are these: Was the loss attributable to the misconduct of the plaintiff, or was it owing to the voluntary doings of the wife, or was it effectuated or induced by the illegal behavior of the defendant? If it occurred, and the defendant was not guilty of any tortious conduct to bring it about, then the action could

not be maintained, and as bearing on the question it was pertinent to inquire into the state of the wife's mind and affection towards the plaintiff and on that subject her letter was legitimate evidence.''

We think there was no error in permitting the testimony that the round-trip ticket was purchased for her at her request.

III. Over the objection of the defendant, the court admitted evidence of the actions of the wife of the defendant. The substance of this evidence was that on one occasion prior to the time the plaintiff's wife went to Toledo, the defendant was at the home of the plaintiff in the absence of the plaintiff, his horse being tied in the alley; that defendant's wife came by and went around the block and turned into the alley where the horse was tied, and she went in the rear way of the Fuller house, and later Mrs. Robinson, the wife of the defendant, and Mrs. Fuller, the wife of the plaintiff, and the defendant, all three came out on the back porch, and when they came out on the porch, Mrs. Robinson seemed very nervous, but the defendant seemed to hold his composure, as did the plaintiff's wife. When this evidence was offered, the objection was that it was wholly irrelevant and incompetent and did not tend to prove any issue in the case. The court overruled the objection and the defendant excepted. This occurred on the first day of the trial, and two days later, and near the close of the plaintiff's case, counsel for the plaintiff stated to the court that he desired to withdraw the following questions and answers, to-wit: "Q. Now, I will ask you this question, to please describe to the jury her manner, and what her conduct was, that you observed, as she went in there? A. As I say, she was apparently very nervous. Q. Go ahead and describe her actions as she went in the house? A. As I say, she was apparently very nervous.''

To this proposition to withdraw the above questions and answers, counsel for defendant said: "We contend that when the plaintiff makes their case, and ask their questions and secure their testimony over the objections of opposing counsel to the ruling of the court, after that matter is all before the jury, they ought to stand or fall by that ruling, and not be permitted, after the testimony is in and the jury has heard it, and of course no human could remove it."

Mr. Moore, of counsel for plaintiff: "Counsel do that right along. We will withdraw it."

Counsel for defendant: "At the time, but this has been two days past. Indeed to have the court say now."

Johnson for plaintiff: "Frequently the court withdraws by instructions."

The Court: "Yes, on account of being improper and incompetent testimony."

Counsel for plaintiff: "Do you object, Mr. Spencer, to the court permitting us to withdraw the testimony?"

Mr. Spencer: "I have stated in the record my position."

The Court: "Well, the court's idea is, that the objection ought to be sustained. I don't think a party, after he has put in his testimony, can take what he wants away from the jury."

Mr. Spencer: "That is true, and no human power can remove it."

Mr. Timmonds: "It can be removed by instruction of the court at this time, or at the conclusion with the other instructions, or both."

The Court: "Yes, but convince the court it is improper testimony."

Thereupon the request to withdraw was denied by the court, as was also an instruction to the jury to disregard the question and answer. Later on in the case, the plaintiff requested the court to give the fol-

lowing instruction: "The court instructs the jury that they will withdraw from their consideration all that part of the testimony of the witness Tom Comeford in reference to the acts and conduct and appearance of the wife of defendant, Budd Robinson, going to the residence of the plaintiff Fuller, at the time mentioned in his testimony. The jury are instructed that such acts, conduct and appearance at that time is irrelevant and immaterial and does not tend to prove any issue in this case and the jury will therefore exclude the same from their consideration in determining their verdict in this case." Which instruction the court refused.

In a word it appears that after this evidence had been introduced, the attorney for the plaintiff being in doubt as to its admissibility, the court was asked to withdraw it and to instruct the jury to disregard it. But the defendant objected and the court refused to do so, because he considered the evidence competent and admissible, and because the defendant objected to this withdrawal and to an instruction to disregard it. In support of this assignment of error the defendant cites the decisions of this court and of the Court of Appeals to the effect that when evidence is shown to have been incompetent and to have been erroneously admitted against the objections of a party, it constitutes reversible error, unless it appears affirmatively not to have been of prejudicial influence, and insists that this evidence was calculated to prejudice the jury against the defendant.

In Stephens v. Railroad, 96 Mo. l. c. 214, the action was for personal injuries. Plaintiff was asked whether he was a married man, and if so, how many children he had, and over defendant's objection, answered that he was married and had four children. The evidence as to the number of his children was conceded to be incompetent. This court said: "Here it is difficult to understand what effect the evidence had,

for the jurors are told not to consider it; yet at the same instant the objection is overruled and the evidence admitted. . . . We do not say that this judgment should be reversed alone on the ground of excessive damages, nor do we say that it should be reversed because of the evidence before noted, had a specific instruction as to the measure of damages been given; but in view of the very general instruction as to damages, and the amount of the verdict, we cannot escape the conclusion that the incompetent evidence had its effect.'' In the same case it was said: ''We have no doubt but that the trial court may exclude improper evidence during the progress of the trial, or by an instruction at the close of the evidence, and when this is done the fact that such evidence was heard by the jury will not operate as a reversal of the judgment.''

In Meyer v. Lewis, 43 Mo. App. 420, the Court of Appeals, after an exhaustive review of the cases on this subject, reached this conclusion: ''We conclude, therefore, that the general rule applicable to civil trials is, that incompetent evidence in the progress of the trial may be withdrawn by the party offering it, or stricken out on his motion, or withdrawn by an instruction admonishing the jury to disregard it so as to cure the error of admitting it. But we are equally of opinion that cases may arise where it will be apparent to a reviewing court, from the nature of the evidence thus admitted, from the other evidence in the case as preserved in the bill of exceptions, and from the verdict rendered by the jury, that the error of admitting it was probably not cured by the withdrawing of it, or the striking of it out, whether by the party offering it, or by the judge in directing the jury to disregard it. Such, in our judgment, is the case before us. The question whether the proximate cause of the injury was the negligence of the defendant's driver or the

negligence of the plaintiff himself, was a very close one upon the evidence, to say the least.''

In Anderson v. Union Terminal Railway Co., 161 Mo. 419, the ordinance prohibiting the backing of trains without a watchman, requiring the ringing of a bell and limiting the rate of speed, was read to the jury without any averment in the petition of acceptance of said ordinance by the defendant. This court said: ''The admission of the ordinances under the rulings of this court in the above cases, was undoubtedly erroneous. But as the objectionable evidence had been eliminated from the case, by instruction, the error in its admission was cured. It is well settled in this State, that where erroneous evidence has been admitted during the trial, the error in its admission may be cured, by afterwards withdrawing the objectionable evidence from the jury.''

While there are many other cases in this court, the foregoing excerpts sufficiently indicate the line of decision in this State, and the question now is whether the admission of this testimony constitutes reversible error. We do not think it does for the reason, in the first place, that the objection to it at the time it was offered was insufficient. It has been so often held that an objection merely, that the evidence is incompetent and irrelevant, amounts to no objection whatever in law, that it is unnecessary to cite cases to that effect. But if it be conceded that the admission of this testimony was technically erroneous, the plaintiff's offer to withdraw it and his request to the court to instruct the jury to disregard it, would in our opinion have cured the error. We say this because when the other evidence in the case as preserved in the bill of exceptions is considered, it is perfectly apparent to us that the jury would have found the same verdict had this evidence not been admitted. By section 865, Revised Statutes 1899, this court is forbidden to reverse the judgment of any court unless it shall believe that error

was committed by such court against the appellant or plaintiff in error materially affecting the merits of the action. Over and against the great mass of the testimony tending to show that the defendant was a despoiler of plaintiff's home, and by his misconduct alienated plaintiff's wife from her duty and caused her to forsake her husband, the defendant failed to take the stand himself and produce the slightest evidence in his defense, and we cannot bring ourselves to believe that the fragment of testimony in regard to the defendant's wife going to the home of plaintiff on the occasion mentioned had any appreciable effect upon the verdict of the jury.

IV. There was no error in admitting testimony that at a certain time defendant's wife ceased visiting at the plaintiff's house. This evidence was of the same character as that discussed in the last paragraph.

In Modisett v. McPike, 74 Mo. 636, the action was for the alienation of the wife's affections. Evidence was tendered to the effect that the defendant's conduct with the plaintiff's wife was the cause of trouble with his own wife, and the circuit court over the objection of the plaintiff excluded it, and this court held it was error, saying: "As a general proposition, in ordinary cases, the testimony must be confined to the issues made by the pleadings, and cannot be allowed to extend to other issues entirely collateral. But where, as in this case, it becomes material to know whether the conduct of defendant has been actuated by good or selfish and improper motives, a wider range is frequently permissible. In such cases, any fact or circumstance calculated to throw light upon the character and nature of the motives of the defendant, in his conduct in the premises, we think may fairly be looked into and considered. [2 Greenleaf on Ev., secs. 41, 42.] For that purpose we think the question and proposed evidence offered might well have been permitted and allowed."

In cases of this character, the authorities generally hold that it is competent to show the relations existing between the two families interested, their surroundings, the class of society in which they move, under what circumstances they are associated together and the intimacy between different members of the two families. This being so, we think it was clearly competent to show that up to a certain time the wives of the plaintiff and the defendant were on friendly and intimate terms of association, and that, after the marked and rather extraordinary conduct of the defendant in visiting plaintiff's wife in the absence of the plaintiff, and after such conduct had attracted the attention of the neighbors, Mrs. Robinson ceased her visits with the plaintiff's wife. We think that under the rule in Modisett v. McPike, supra, this evidence was clearly admissible.

V. Defendant insists that the verdict was so clearly excessive as to call for a reversal of the judgment. Defendant insists there was no basis for punitive damages and the petition counted on compensatory damages alone. It is urged that this is the largest verdict for an offense of this kind reported in our decisions.

The rule on this subject was stated in Minter v. Bradstreet Company, 174 Mo. l. c. 504, as follows: "The reason for holding parties so tenaciously to the damages found by the jury in personal torts is, that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury governed by a sense of justice. . . . To the jury, therefore, as a favorite and almost sacred tribunal, is committed, by unanimous consent, the exclusive task of examining the facts and circumstances, and valuing the injury and awarding compensation in damages. The law that confers on them this power and exacts

of them the performance of this solemn trust, favors the presumption that they are actuated by pure motives . . . and it is not until the result of the deliberation of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice and passion, that courts have found themselves compelled to interpose.''

In Speck v. Gray, 45 Pac. 143, an action was brought for the alienation of the wife's affections, for dishonor and disgrace suffered by the respondent by reason of such alienation and the ruination of his home, and the damages asked were $25,000. The jury rendered a verdict for plaintiff for $15,000, and the defendant contended that the verdict showed passion and prejudice. In the course of its opinion, the court said: ''From the very nature of this kind of a case, if the injury is to be compensated in money at all, it must be seen that there is no basis upon which an appellate court can determine reasonably whether the jury acted under the control of passion or prejudice; and, if they could in any case, it is not discernible in this case. The testimony shows that the respondent and his wife were respectable people, that she was intrusted with the care and education of the children in that community, and received good wages as a school teacher. The respondent was a lawyer, and, at least, commanded the respect of the people of the country in which he lived sufficiently to be elected to the office of prosecuting attorney. The testimony shows, and is not disputed, that the relations existing between the husband and wife prior to the advent of the appellant were not only cordial and friendly, but very affectionate. Outside of the amount of money which would necessarily be involved in the breaking up of a home, there are questions which are so largely and purely sentimental, submitted, too, peculiarly to the discretion of the jury which tries the case, that, unless the amount found as damages should be clearly shown to

be the result of passion and prejudice, the court would not be warranted in reversing the case on the ground of excessive damages.''

So in this case, we have for respondent a young business man, honest, intelligent, capable, industrious, as is attested by his long service in the employment of a large concern, married to a young and attractive wife, with whom he had lived happily for ten years. While the court excluded the evidence offered by the plaintiff to show that the defendant was a man of wealth, worth from one hundred to two hundred thousand dollars, there was still evidence in the record tending to show that he was a man of large means, and while the plaintiff was at work from early morning until late at night, supporting his wife in comfort and gentility, the defendant was using his leisure in visiting at the plaintiff's house and paying his attentions to the plaintiff's wife. And this conduct resulted in robbing the plaintiff of her love, society and comfort. Under such circumstances this court is not called upon, nor authorized to assess the value of plaintiff's wife, but that duty, under our Constitution and laws, was committed to the jury. It was for the jury to estimate the wrong upon plaintiff's character and condition and upon his future life, and in our opinion there is nothing in the verdict which would authorize us to set it aside as excessive.

VI. The defendant requested and the court refused the following instructions:

''If you believe from the evidence that the plaintiff encouraged, consented to, or connived at the association of his wife with defendant, and that because of such association, and without the defendant so intending, such association caused plaintiff's wife to lose her affection, if any she had, for plaintiff, then your verdict will be for the defendant.''

''If you shall believe from the evidence that plain-

tiff encouraged his wife in her attentions to the defendant or connived thereat, and that by reason of her attentions towards the defendant she became estranged from plaintiff without any wrongful influence on the part of the defendant, then your verdict must be for defendant."

On this point the court gave the following instruction:

"Yet, if you shall further believe from the evidence that plaintiff permitted or connived at, or consented to or encouraged such attentions and conduct from the defendant to his wife or from his wife to the defendant, then your verdict must be for the defendant, notwithstanding you may believe from the evidence that such attentions and conduct finally resulted in alienating the affections of the plaintiff's wife from him and in her separation from him.

"Fifth: That if she had any affection for plaintiff and the same was alienated by the conduct and actions of plaintiff himself towards her, or by his neglect of her, or from any cause whatever, other than the attentions, conduct or influence of defendant, with the wrongful and willful purpose and intent of alienating her affections from her husband, or inducing her to separate or remain away from him, then your verdict will be for the defendant."

As to the proposition advanced by the defendant that he must have intentionally brought about the alienation, the instructions given in his behalf fully submitted that phase of the case to the jury. Indeed the instructions were as favorable, if not more so, than the defendant had a right to ask of the court. It would unnecessarily extend the length of this opinion to copy them at length. There was no error in refusing the instructions complained of as they were fully covered by others in the case.

VII. It is insisted that the closing argument of plaintiff's counsel was bitter and full of error and

appealed to the passions of the jury and went outside of the evidence. We have read the record on this point and the only words used by the counsel for the plaintiff which were particularly objected to are: "that he had deserted his own wife and that the defendant should be punished for his conduct." On the objection of counsel for defendant those words were stricken out by the court and counsel for the plaintiff admonished to abstain from their use. Moreover, after reading the bill of exceptions and the statements made in the argument of counsel for defendant, in which he had denounced the plaintiff as "an infernal scoundrel," and "a perjured liar," a man who after encouraging defendant's familiarity with his wife had come now to court to punish and mulct his friend in damages, we think the provocation to plaintiff's counsel, in answer to such statements, was very great, and did not transcend the right of counsel to argue his case and to meet the aspersions cast upon his client. We think there is no merit whatever in this assignment.

VIII. There was no error in permitting the plaintiff to show that the plaintiff and the defendant were members of the same fraternal order. Moreover, the objection to it was merely that it was irrelevant and immaterial and amounted to no objection at all. The same testimony had been admitted previously without any objection on the part of the defendant, and had been testified to by the defendant in a deposition which he had signed and which was admitted also without objection.

IX. Defendant predicates error on the action of the court in permitting plaintiff to identify certain photographs of signatures as those of the defendant and plaintiff's wife. As to this evidence the plaintiff showed first that it was not within his power to produce the original hotel register. He then introduced

photographs of the register in connection with the testimony of the clerk of the hotel accounting for their genuineness, and plaintiff then identified the signatures of this photograph of the hotel register as the signatures of his wife and of the defendant. These registers were in Chicago, Illinois, and could not be produced under a *subpoena duces tecum*. In Banstain v. Young, 152 Mo. l. c. 324, this court said: ''The art of photography is also not exempt from the possibility of perversion and of being made the means of creating false appearances. The Supreme Court of Pennsylvania has said: 'Photographs are competent evidence, and when properly taken are judicially recognized as of a high character of accuracy. But in careless, or inexpert, or interested hands they are capable of very serious misrepresentations of the original.' [Beardslee v. Columbia Township, 188 Pa. St. l. c. 502.] We hold therefore that the photographs in question while not evidence independent of the witness, were nevertheless in evidence as illustrations of the witness's testimony, and the plaintiff was entitled to have them considered as such for what they were worth. This is in accordance with previous rulings of this court. [Mincke v. Skinner, 44 Mo. 92; Williamson v. Fischer, 50 Mo. 198; State v. O'Reilly, 126 Mo. 597; Geer v. Lumber Co., 134 Mo. 85.]''

The Supreme Court of New Jersey has said, ''As evidence, photographs have been held as admissible upon the question of identity and comparison of handwriting, and as secondary evidence when the primary and better evidence could not be obtained. It may be generally regarded as a rule that they are never admitted but as secondary evidence.'' [Goldsboro v. Railroad, 60 N. J. L. l. c. 51.] Where an instrument in writing is neither within the jurisdiction of the court nor within the control of either of the parties to the suit, secondary evidence of its contents is admissible. In our opinion, the photograph of the register with

Fuller v. Robinson.

the names of the defendant and the plaintiff's wife thereon, was competent, in connection with the testimony of the plaintiff that the signatures purporting to be the signatures of his wife and the defendant were theirs. He knew their signatures and was competent to testify without having been shown to be an expert. But if there was any error in the admission of this photograph, it was harmless in this case, as the only purpose of the photograph was to prove that Mrs. Fuller and the defendant Robinson were registered at a certain hotel in the city of Chicago at a certain time, which fact was expressly testified to by the defendant in two depositions, and hence no possible harm could have resulted to the defendant from the introduction of the photograph.

X. There are several other assignments, but they are of a trivial character and do not in the least affect the merits of the case, and it is sufficient for us to say that we have examined each and every one of them and in our opinion they afford no ground whatever for the reversal of this cause.

After a careful examination of the whole record and all the exceptions pressed on our attention by the defendant, we are of the opinion that no reversible error was committed in the trial of the cause and the judgment should be and is affirmed.

*Burgess* and *Fox, JJ.,* concur.