John L. Rice, Respondent, v. Dr. M. S. Gray et al., Appellants.— 34 S. W. (2d) 567.

Kansas City Court of Appeals. December 1, 1930.

*S. P. Davisson* and *Eastin & McNeely* for respondent.

*Brown, Douglas & Brown* and *Thompson & Griswold* for appellants.

ARNOLD, J.—This is an action in damages, both actual and punitive, for alleged conspiracy and false incarceration in the state insane asylum No. 2, at St. Joseph, Mo.

The suit was instituted originally against Dr. M. S. Gray, Dr. F. G. Weary, C. L. (Lee) Rice (plaintiff's son), Clyde Paxton (plaintiff's son-in-law) and Anna Rice (plaintiff's wife). During the progress of the trial the cause was dismissed against Anna Rice for the reason that the law does not permit a husband to maintain a suit in tort against his wife. The facts of record are that plaintiff and his family resided in St. Joseph and for a number of years plaintiff was employed as stationary engineer. He had accumulated some property consisting of dwelling houses which he let, said property being held as estates in the entirety by him and his wife. There were deeds of trust against these properties but rentals took care of the taxes and interest and paid something on the principal, but in order to accomplish this result, plaintiff practiced more or less rigid economy.

Some ten or twelve years prior to the occurrences giving rise to this suit, plaintiff developed a case of St. Vitus's dance, the exact nature of which is here in dispute. The testimony shows this disease is manifested by involuntary and uncontrollable twitching and jerking of the muscles; that medical science makes two classifications of these symptoms, namely, Huntington's chorea and Sidenham's chorea; that the word chorea may mean merely St. Vitus's dance; Sidenham's chorea or Huntington's chorea with psychosis, or mental derangement, insanity. The disputed point is whether plaintiff was afflicted with Sidenham's chorea or Huntington's chorea with psychosis. The record discloses that plaintiff's involuntary jerking of muscles became so advanced that his services as a stationary engineer were no longer desired by employers and he was thereafter without employment and remained at home. His family consisted of his wife, who lived in the home, his son, defendant Lee Rice, who lived near; his daughter, Mrs. Paxton, who with her husband, defendant herein, lived part of the time in the home of plaintiff; and another daughter who was employed and lived at the home.

It appears plaintiff and his wife entered into an agreement that each was to assume certain expenses in connection with the household. The wife kept some boarders and sold milk from a cow they kept and from funds thus derived paid the bills for groceries and other expenses not clearly defined in the evidence. Plaintiff was to supply the coal and pay the taxes and interest charges.

The evidence in behalf of defendants shows plaintiff was nervous, high tempered, easily excited and disturbed and at times he was morose. The testimony shows the house in which the family lived was without modern improvements such as a furnace, city water and inside toilet conveniences which the family desired but to the instalment of which plaintiff objected because of the expense and because it would be necessary to tear up the lawn. This situation produced

some discord in the family. That on March 30 or 31, 1926, there was a deep snow falling, or had fallen, when defendant Paxton came home and found no fire in the stove in the sitting room; that he proceeded to use kindling wood which plaintiff had prepared to build a fire; that plaintiff objected and the incident furnished the basis of another family dispute, the exact details of which need not be here stated. About the same time, Lee Rice came to plaintiff's home and there was something of a disturbance between him and his father about there being no coal for fire. Plaintiff ordered his son to leave the house and not return, and defendant's testimony is to the effect plaintiff threatened to get a gun and shoot Lee, but this was denied by plaintiff.

It appears a family conference was held in which plaintiff did not participate and it was decided plaintiff needed some medical treatment and should be taken to the hospital for the insane for such treatment, as a pay patient; but, not knowing how to proceed in the matter, defendant Lee Rice consulted defendant Dr. M. S. Gray who advised that such a procedure required an application and a verified certificate of two physicians; that necessary blanks could be had at the asylum No. 2. Thereupon defendants Lee Rice and Clyde Paxton went to the asylum, got the blanks and had Doctors Gray and Weary sign them. The certificate was as follows:

"Physician's Certificate.

"State of Missouri,

"County of Buchanan, ss.

April 1, 1926.

"We, M. S. Gray and F. G. Weary, of the county aforesaid, physicians, do hereby certify that we have this day seen and examined John H. Rice, of the County of Buchanan, and believe him insane and a proper patient to be sent to the State Hospital Number Two.

"(Signed)   M. S. GRAY,

"F. G. WEARY."

The certificate then was taken to a notary public who called the signers over the telephone, verified the signatures and attached his jurat and seal thereto. The application for plaintiff's admission to the institution was executed by plaintiff's wife, and is as follows:

"Application.

"To the Superintendent of the State Hospital Number Two:

"The undersigned of the County of Buchanan is desirous of placing in the State Hospital Number Two, and hereby requests the admission of John H. Rice, a resident of Buchanan County, Missouri, whose age is fifty-eight (58), and has been stationary engineer. He is a native of Harrison County, Missouri, and is the husband of the undersigned.

"(Signed)   ANNA RICE."

The application and physicians' certificate were filed with the officials of State Hospital number Two, as a necessary procedure. On April 1, 1926, the services of the sheriff of said county were secured by defendant Lee Rice and said sheriff and Lee Rice went to the home of plaintiff and without notice to him, took him to said asylum and turned him over to the authorities thereof and he was confined. During the period in which he was confined, he was twice paroled, first from July 3 to July 6, 1926, and again from July 29, 1926 to January 17, 1927. With the exception of the periods covered by these paroles, plaintiff was in said hospital until May 24, 1927, when he was released by the circuit court of Buchanan county on a writ of *habeas corpus*.

The record shows that on receiving a pay patient in the hospital for the insane, there is a requirement that a bond for the charges and expenses must be executed. Accordingly a bond was made with Anna Rice, as principal, and defendants C. L. Rice and Clyde Paxton, as sureties. During the time plaintiff remained in the asylum, the record shows his family installed a furnace in the house, put in plumbing equipment, and allowed the properties to fall in arrears for taxes and payments of interest. On the day plaintiff was discharged by writ of *habeas corpus*, Anna Rice filed an information in the probate court of Buchanan county, charging plaintiff with being a person of unsound mind. Upon a trial thereon he was discharged.

The petition alleges a conspiracy in the following language:

"That on the said first day of April, 1926, the said defendants, M. S. Gray, F. G. Weary, C. L. Rice, Clyde Paxton, and Anna Rice cooperated and conspired together for the purpose of confining the said plaintiff in the said State Hospital Number Two, located in Buchanan County, Mo."

The petition contains a specific allegation relating to the certificate executed by Doctors Gray and Weary, as follows:

"The plaintiff further states that the certificate sworn to by the said M. S. Gray and F. G. Weary, defendants, was false and untrue in this, (and) that the said M. S. Gray and F. G. Weary had not seen this plaintiff on said date sworn to in said certificate, nor had they examined him on said date as sworn to in said certificate, and that the said certificate executed by the said defendants M. S. Gray and F. G. Weary was wholly false and untrue."

The prayer is for actual damages in the sum of $25,000 and punitive damages in the same amount.

Defendant Gray interposed a demurrer to the petition which was overruled, whereupon he filed an answer consisting of a general denial. Defendants Anna Rice, C. L. Rice and Clyde Paxton filed a general denial and after their motion to strike out certain allegations of the petition was sustained, they filed an amended answer admitting Anna Rice to be the wife of plaintiff, C. L. Rice, his son

and Clyde Paxton, his son-in-law; and that defendant Anna Rice, on April 1, 1926, signed the application for admission of plaintiff to the state hospital No. 2, for treatment, but denying each and every other allegation of the petition. For further answer and affirmative defense, it is alleged plaintiff was insane on April 1, 1926; that he was in a highly nervous and violent state, incapable of taking care of himself, and in such a nervous, irresponsible and violent state of mind that he endangered the safety of defendant Anna Rice and the public; that on March 31, 1926, plaintiff became violent and irresponsible and threatened the life of members of his family; threatened to get a gun and take the life of C. L. Rice; that following such outburst and threat plaintiff did on said 31st day of March, 1926, depart from the home for the avowed purpose of obtaining a gun, and returned to the neighborhood a short time thereafter and loitered and concealed himself about the garage, outbuildings and premises at the home of C. L. Rice, and by his said actions and conduct placed these defendants in fear of their lives and safety; that for a long time prior to said date the mind and faculties of plaintiff had been impaired and failing and he had been subject to violent fits of temper during which his actions and conduct were excited, irresponsible and threatening. Further answering, defendants alleged that on April 1, 1926, defendant Anna Rice, acting in her own behalf and at the request of the mother of plaintiff and on account of the violent, insane and irresponsible condition of plaintiff, signed an application for his admission to state hospital No. 2, for treatment as a pay patient, for that purpose and no other; that such action was taken by her on her own responsibility, after a conference with plaintiff's mother, to obtain proper medical treatment, and no other; that at said time plaintiff had no other guardian than his wife who assumed to act as his natural guardian.

A motion to strike certain parts of the answer was overruled and plaintiff filed a general denial thereto. Upon the issues thus made the cause went to trial to a jury, resulting in a verdict for plaintiff and against all of the defendants, in the sum of $1,000 actual and $2,000 punitive damages, and judgment was entered accordingly. Motions for a new trial and in arrest of judgment in behalf of all the defendants were overruled and all have appealed.

There are sixteen assignments of error discussed under ten headings which we shall consider as follows: First, it is urged the court erred in refusing instructions in the nature of demurrers offered by the several defendants; that, under the pleadings and undisputed evidence, plaintiff is not entitled to recover against any of the defendants. It is argued the evidence shows plaintiff was admitted to the hospital for treatment as an insane person in the manner provided by sections 12273 to 12278, Revised Statutes 1919; that the restraint complained of was upon valid process provided by statute for treat-

ment of insane persons, for which none of the defendants is liable. The sections referred to are in Art. 7, ch. 111, Revised Statutes 1919, entitled "State Board of Charities and Corrections—Institutions." Art. 7 is entitled "State Hospitals—Admission of Patients thereto, and Special Provisions Relating to same." Section 12273 provides pay patients, that is those not sent by order of any court, may be admitted as provided in sections following, and the section following provides specific directions for the admissions of such patients. First, a request upon a form prescribed by section 12275, "under the hand of the person by whose direction he is sent. . . ." Section 12276 requires the certificate of two physicians on the form prescribed therein, and sections 12277 and 12278 provide for a bond to assure payment of charges for board, clothing, etc.

In support of their position in this respect defendants cite a number of cases which on examination are found to apply in cases where action was instituted after probate court inquiry, and "due process" was not questioned. On this point plaintiff urges valid process will not protect in an action for false imprisonment. We find authorities cited support this position.

There is a distinction between malicious prosecution and false imprisonment. In Dunlevey v. Wolferman, 106 Mo. App. 46, 50, ELLISON, J., speaking for this court said:

". . . in action for false imprisonment, honesty of purpose and intention will not excuse the trespass. . . It takes less to constitute false imprisonment than malicious prosecution. . There is a distinction stated which is to be borne in mind: that false imprisonment is an interference with the personal liberty of the party complaining which is unlawful and without authority. In malicious prosecution the arrest would be by process lawful and regular in itself, but sued out from malicious motives and without probable cause. Yet, in false imprisonment, as in slander, honest intentions and mistake will constitute mitigation."

Malice is charged in the case at bar and the jury by its verdict found malice. Therefore "due process" goes only in mitigation. "Process" or "due process of law" has been defined as:

"Any legal proceeding enforced by authority, whether sanctioned by age or custom, or newly devised in the discretion of the legislative power, in furtherance of the general public good, which regards and preserves these principles of liberty and justice. [Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. 111, 292, 28 L. Ed. 232;" 1 Bouvier, pp. 946-7.]

It has been held the fundamental requirement of due process is opportunity for hearing and defense. [Davidson v. City, 96 U. S. 97.] In Hunt v. Searcy, 168 Mo. 158, 180, 67 S. W. 206, MARSHALL, J., said:

" 'Due process of law' implies and requires notice. And any enactment which authorizes a person to be deprived of life, liberty, or property without notice and an opportunity to be heard, though passed in the form of an enactment, is not due process of law or, the law of the land.'' [Citing cases.]

In the case at bar no judgment is sought against the officers who transported plaintiff to the asylum; hence defendants' citations have no application here where the suit is upon a charge of conspiracy of the parties securing plaintiff's imprisonment. Under the authorities above cited we may not hold there was "due process" and we rule against defendants on this point. Defendants' citations do not support a contrary ruling.

Under this assignment it is insisted the State has power as *parens patriae* of persons within its borders to prescribe any reasonable procedure to accomplish or make available institutional treatment, and persons participating in commitment to an institution under such procedure are not liable for participation therein. Numerous cases in foreign jurisdictions are cited in support of this argument. While it is true the state has power to prescribe procedure under which one may be received as a pay patient for treatment in hospitals for the insane, we cannot accept as conclusive the statement that persons participating in such commitment are not liable under any and all circumstances. While the State is charged with the duty of caring for the insane within its borders, yet it may not adopt a procedure in violation of the liberty of its citizens. The power of the State in that respect is limited by the constitutional rights of its citizens. [Shapley v. Cohoon, 258 Fed. 1; c. 755.] The authorities cited by defendants are not contrary to this rule.

It is further urged, under point 1, that under the provisions of sections 12273 to 12278 inclusive, Revised Statutes 1919, the physicians certifying to the malady of a patient are *quasi*-judicial officers and, therefore, protected. This position is untenable. Physicians are not *quasi*-judicial officers. They have no public duties to perform as such; they take no judicial oath of office and perform no public functions. Because the statute requires the certificate of two physicians in cases of this kind, the physicians are not thereby created *quasi*-judicial officers. If they were, the same rule would render the maker of the application, which is likewise a statutory requirement, not liable.

Under subdivision "d" of point 1, it is insisted a patient admitted to the hospital under the provisions of sections 12273-8, inclusive, may always proceed in his own name, obtain a discharge or review of the grounds of his admission, as plaintiff ultimately did in this case, by application for a writ of *habeas corpus:* that where the procedure admits of such review, the statutes are held constitutional.

Of course we are not passing upon the constitutionality of the law and we need not consider this point further than to observe that

898

the writ of *habeas corpus* was devised to test the legality of personal restraint. [State ex rel. v. Broaddus, 245 Mo. 123, 140, 149 S. W. 473.] The writ is not available if the restraint is shown to be legal. Let us suppose that no one appears for a patient to institute *habeas corpus* proceedings, or suppose he is unable to institute an inquiry into the cause of his incarceration. The patient would be required to spend the rest of his life under a possibly illegal confinement. Such a situation is unthinkable.

Under point 2, it is urged the court erred in refusing to give the peremptory instructions in the nature of demurrers to the evidence, at the close of plaintiff's case and again at the close of all the evidence in behalf of defendant Gray. The basis of this argument is that Gray was a *quasi*-judicial officer and as such was privileged or immune from liability for his act in making the certificate in question, or that, at least, he was a witness in privileged proceedings under the statute and, as such, immune from liability. We have already passed upon the question of the doctor's status as a *quasi*-judicial officer, against defendant's contention. Under this assignment, it is further contended this defendant should be held to be a witness in privileged proceedings under the statute and, as such, immune from liability. Defendant cites three cases from foreign jurisdictions which, on casual reading, might be thought to support defendant's theory, but on careful reading are found not to apply for, in each instance, the opinions were rendered in cases where the witnesses testified in court proceedings to test the plaintiff's sanity. While in the case at bar the verified certificate was wholly *ex parte* and voluntary, where defendants may be held to have known that upon that certificate plaintiff would be deprived of his liberty. The rule urged by defendants does not apply here. It is urged the petition attempts to state a cause of action against defendant Gray on the theory of an active conspiracy in which he participated; that it charged him with intentional wrongdoing; that there was no evidence to support this charge and plaintiff voluntarily abandoned it by submitting an instruction which was given as to Dr. Gray, on the theory that if the other defendants conspired Dr. Gray would be liable if he were merely guilty of negligence in making the certificate; that such an instruction broadened the issues and is a departure.

The petition alleges that all the defendants, including Dr. Gray, cooperated and conspired together for the purpose of confining plaintiff in the asylum. Part of the instruction just referred to properly defines conspiracy, as follows:

"You are instructed that no formal agreement between the defendants to do the act is necessary to create a conspiracy. It is sufficient that the minds of the parties meet understandingly so as to bring about an intelligent and deliberate agreement to do the acts complained of, and such agreement need not be manifested by any

formal words. It is sufficient if the defendants, by their acts, one performing one part of the act and the other, or others, other parts of the act, all contribute to complete the act, with the purpose of attaining the object complained of. It is not essential that each should know the exact part to be performed by the others in the execution of the common design.''

This instruction does not abandon the charge that Dr. Gray was in the conspiracy. There is no departure in this respect. It is plaintiff's position that Dr. Gray either knew plaintiff was not insane or that he did not take pains to find out whether he was or not; that the certificate was furnished with knowledge that it was false, or without learning that it was false. The general rule in this respect is stated in 12 C. J. 544, note 27, as follows:

''It is not necessary to constitute a conspiracy that two or more persons should meet together, and enter into an explicit or formal agreement for an unlawful scheme, or that they should directly, by words or in writing, state what the unlawful scheme was to be, and the details of the plan or means by which the unlawful combination was to be made effective. It is sufficient if two or more persons, in any manner, or through any contrivance, positively or tacitly come to a mutual understanding to accomplish a common and unlawful design. In other words, where an unlawful end is sought to be effected, and two or more persons, actuated by the common purpose of accomplishing that end, work together, in any way, in furtherance of the unlawful scheme, every one of said persons becomes a member of the conspiracy, although the part he was to take therein was a subordinate one, or was to be executed at a remote distance from the other conspirators.'' [Citing U. S. v. Cassiday, 67 Fed. 698, 702; Taylor v. State, 3 Tex. App. 169.]

The jury, under instruction ''A'' were required to find, which they did, that Dr. Gray participated in the alleged unlawful conspiracy. We must hold the case submitted was the case pleaded.

Subdivisions c and d of point 2 are arguments from different viewpoints of subdivision a. We have fully determined this point against defendants' contention and need not discuss it further. The same ruling applies to defendants' point 3, which approaches the question from a different angle, to the effect (a) that there was no proof that the doctors who signed the certificate participated in any conspiracy: (b) that there was no proof that defendants participated in the formation of any plan or scheme to commit plaintiff to the asylum; (c) that defendants were messengers of the law and are not liable for the mere act of conveying the application and certificates for plaintiff's admission to the hospital. A mere reference to the statement of facts and the instruction referred to is a sufficient re-

futation of this argument. We rule against defendants on this point.

Point 4 again enlarges upon the discussion already presented in the brief to the effect that the proceedings under which plaintiff was confined in the asylum, being statutory, constituted due process; and again reference is made to the specific allegations of the petition. We have already discussed the matter of "due process" and need not discuss it further here. Subdivision b, of this point, refers to the specific allegation in the petition that the certificate was false, in that the doctors had not seen plaintiff on the day the certificate was executed. It is urged this specific allegation overrides the more general allegation that the certificate was generally false. The so-called general allegation is as follows:

"The plaintiff further states that the certificate sworn to by the said M. S. Gray and F. G. Weary, defendants, was false and untrue in this, (and) that the said M. S. Gray and F. G. Weary had not seen this plaintiff on said date sworn to in said certificate, nor had they examined him on said date as sworn to in said certificate, and that the said said certificate executed by the said defendants M. S. Gray and F. G. Weary was wholly false and untrue."

The specific charges referred to are the declarations in the certificate executed by the physicians that "we have this day seen and examined John H. Rice," and "believe him insane and a proper patient to be sent to the State Hospital Number Two." The clause in the general allegation to the effect that the certificate was wholly false and untrue may be accepted as a denial that plaintiff was insane on April 1, 1926, as stated in the certificate. We hold there is no contradiction between the two allegations and that the specific allegation does not override the general one. But, even so, the denial of the fact that plaintiff was insane on said date is further and fully set forth in the petition, as follows:

"That on said date he was in his usual health and was capable of attending to his business affairs."

The burden thus was cast upon plaintiff to show he was not insane on April 1, 1926, and the instruction complained of required the jury so to find. The instruction was not error in this respect.

Defendants further contend instruction "A" is erroneous because it abandons the charge of conspiracy against defendant Gray and permits recovery against him on the theory that defendants were liable if defendant Gray carelessly but intentionally made an insufficient examination and committed an error of judgment. We have already fully discussed and determined against defendants' contention this phase of the case as applied to the instruction complained of. A further discussion of this point would avail nothing. In this assignment defendants' theory of departure is repeated and

in this respect it is urged plaintiff's instruction "A" and defendant's instruction "2" are in conflict. Reading the two together, as must be done, it is obvious defendants' instruction 2 adopts the theory presented in plaintiff's instruction "A" and there is no conflict. Having asked instruction 2, defendants may not now be heard to complain. Instruction A is further attacked in the charge that it assumes a wrongful imprisonment. Defendants say the latter part of instruction A "contains the positive assumption that the plaintiff's confinement in the state hospital was a wrongful imprisonment." It is pointed out this is a misleading and unwarranted assumption, and the instruction is erroneous. We have carefully read instruction A, and fail to find that it makes the assumption charged. It requires a finding of all material facts. Plaintiff calls our attention to the fact that his instruction "X" asked, does offend in the manner complained of, but this instruction was refused by the court, and was modified and given as instruction A. We find this to be true.

It is urged the court erred in refusing defendants' instructions "GG," "HH" and "II." These were properly refused because they do not embody the facts upon which the defense was based. They do not include reference to the evidence of conspiracy. Shorn of this necessary element, these instructions are only abstract declarations of law. They predicate a finding for defendant Gray without requiring a finding that he was not in the conspiracy, or that he participated in the alleged unlawful act. Therefore they were properly refused. Instruction "II" requested a withdrawal of certain evidence as applied particularly to Anna Rice. The petition charges she was in the conspiracy. The case against her was dismissed because, being the wife of plaintiff, she was not subject to a judgment. [Rogers v. Rogers, 265 Mo. 200, 209, 177 S. W. 382.] We hold the evidence as to her acts was admissible as against all who acted with her in the alleged conspiracy. There was no error in the ruling of the trial court on this point.

Finally it is urged the verdict was "against the overwhelming weight of the evidence, and plaintiff wholly failed to prove the existence of a conspiracy by any of the defendants." There was substantial proof on behalf of plaintiff in support of the allegation of conspiracy, and this was refuted by defendants. We are not authorized to pass upon the weight of the evidence, that being wholly within the province of the jury. This court in Monson v. Rouse, 86 Mo. App. 97, held, in effect, that liability for false imprisonment is not confined to the parties restraining and confining the plaintiff, but extends to all persons instigating the unlawful seizure if the illegal restraint is continued by their direction and assistance. The case was well tried, we find no reversible error of record, and the judgment is affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.