ELIZABETH BROWNING, RESPONDENT, v. HOMER BROWNING ET AL., APPELLANTS.—41 S. W. (2d) 800.

Kansas City Court of Appeals. April 6, 1931.

*F. P. Stapleton, James F. Gore, Cook & Cummins* and *Shinabarger, Blagg & Ellison* for respondent.

*J. W. McKnight, Ed Kelso, H. G. Hunt, Gerlash & Gerlash* and| *Dubois & Miller* for appellants.

ARNOLD, J.—This is an action in damages for the alleged alienation of the affections of plaintiff's husband by the defendants.

Elizabeth Browning was a minor at the institution of this suit which was returnable to the August term, 1928, of the circuit court of Atchison county, Missouri, and the suit was begun in the name of her father, Roy L. Hulse, as next friend. Defendant Homer Browning is the father of Cameron Browning, husband of Elizabeth; and defendants Frank and Jane Browning are the parents of Homer. The cause was tried in the circuit court of Atchison County where a mistrial was declared. At the February term, 1929, of said court, on application of plaintiff, a change of venue was taken to the circuit court of Gentry county and the cause was tried there at the September term, 1929, resulting in a verdict and judgment for plaintiff in the sum of $4,000 compensatory damages. Motions for a new trial and in arrest of judgment were unavailing and defendants have appealed.

The record discloses Elizabeth Hulse and Cameron Browning were married on February 26, 1927, at plaintiff's home, both families being present. The young people were students in Fairfax high school in Atchison county where they first met; such meeting and subsequent association finally resulting in their marriage, as above recited. Prior to and at the time of said marriage plaintiff was living with her father, Roy L. Hulse, editor of a newspaper, the Fairfax Forum. Cameron Browning lived with his father and mother on a farm two and one-half miles southwest of Fairfax. It appears plaintiff's parents opposed the marriage on the sole ground of plaintiff's youth, she being eighteen years of age at the time. After the wedding the young couple went on a wedding trip to St. Joseph and Kansas City, Missouri, in an automobile which, with some funds for expenses, were furnished by defendants. They were gone about a week and on their return, went to the home of plaintiff's parents in Fairfax where they remained two or three days. Then, taking plaintiff's personal effects, they moved into the home of Homer Browning on the farm, there to make their home. It appears this arrangement was agreed upon prior to the marriage. It further appears plaintiff had never lived on a farm and was unfamiliar with its requirements; that her activities had been confined to the duties of her parents' home and helping her father in the publication of his newspaper.

The Browning farm consisted of 315 acres and when the young couple went there to live the house was occupied by them and Homer Browning and his wife. Defendants Frank and Jane Browning lived in Fairfax. At the time Cameron Browning and his wife moved onto the farm, Homer Browning was in poor health and suffering from a goitre, for the treatment of which he and his wife, Marie, went to Rochester, Minnesota, and remained there for about six weeks.

There is testimony tending to show that after the young people moved to the farm there was no friction for about three weeks. However, plaintiff's evidence shows that on their arrival at the farm, some friction arose between Homer Browning and herself; that this continued until he left for Rochester and was renewed on his return. It appears defendants Frank and Jane Browning came often from their home in Fairfax to the farm, during the absence of Homer Browning, the former aiding in feeding the cattle and hogs, and the latter assuming some direction of the household activities. The testimony shows there arose much friction between the Frank Brownings and plaintiff, caused by criticizing remarks against plaintiff by these Brownings, made in the presence of plaintiff's husband. The exact nature of these remarks will be referred to hereafter as required.

About August 1, 1927, Homer Browning told plaintiff and her husband they would both have to get out if they did not do differently, but if they did do differently, they might stay. On August 7, plaintiff took her personal belongings and went to the home of her father in Fairfax, Cameron going to Oklahoma, but at this time, so plaintiff testified, there was no friction between her husband and herself. Cameron wrote three letters to his wife from Oklahoma which she answered. She stated her husband wrote her no more, but that she wrote him several letters thereafter which he did not answer. There is no showing in the record that there was any correspondence between Cameron and the defendant while he was in Oklahoma except on August 31, 1927, when Cameron telegraphed his father to send him some money. Instead of sending money, Homer Browning telegraphed a railroad ticket for his son's return to Fairfax which Cameron refused to accept. Late in November of the same year, Cameron returned to Fairfax for a few days but did not inform plaintiff of his return. He soon returned to Oklahoma where he stayed until February, 1928, when he again came to Fairfax and remained until the trial of this suit in September, 1929. During all this time there was no communication, nor attempt at communication, between plaintiff and her husband, and in fact they ceased recognition of each other.

The petition alleges the facts of plaintiff's marriage to Cameron Browning on February 6, 1927; of the relation of parties defend-

ant; that from the date of plaintiff's marriage until August 7, 1927, the couple lived happily together as husband and wife, and enjoyed the aid, support and companionship, society and affection of each other; that defendants "wrongfully, wickedly and maliciously acted, conspired, confederated and cooperated together, with the wrongful, wicked and malicious intent to cause plaintiff's said husband to leave and abandon her and to cease living with plaintiff as her husband, and to deprive plaintiff of the aid, support, companionship, society, protection and affection of her said husband; that, on or about August 1, 1927, the defendants, pursuant to their wicked, wrongful and malicious intent, did wrongfully, wickedly and maliciously entice, influence and induce plaintiff's said husband to leave and abandon her; that her said husband being influenced by and acting under the said wrongful, wicked and malicious enticement, influence and inducement of defendants, did then and there leave and abandon her, and being influenced by and acting under said wrongful, wicked and malicious enticement, influence and inducement, has ever since remained away from and separate and apart from her without her fault and contrary to her desires and wishes; that ever since said abandonment, the defendants have wrongfully, wickedly and maliciously detained and harbored plaintiff's said husband, and have kept him separate and apart from her, and have, by their said wrongful, wicked and malicious acts and conduct deprived plaintiff and still do deprive her of the aid, support, companionship, society, protection and affection of her said husband, Cameron Browning; and that this plaintiff has been humiliated and disgraced by reason of the said defendants' wrongful, wicked and malicious acts and conduct as aforesaid and has suffered great anguish and distress of body and mind . . ."

Judgment is asked in the sum of $15,000, actual and $10,000 punitive damages. The second amended answer, on which the cause was tried, admits the marriage of plaintiff to Cameron Browning and that she is now his wife, as alleged in the petition, and generally denies all other allegations therein contained. As further answer, it is averred Cameron Browning had no property and defendants furnished plaintiff and her husband a good home, provided for them, and did everything they could to induce plaintiff and her said husband to get along and live happily together; that their separation and their now living apart were caused by "the misconduct of plaintiff and the conduct of her said husband Cameron Browning, and through no fault or act of these defendants, or either of them."

The answer further avers that soon after the marriage of plaintiff and her husband, they went to the home of defendants to live and engage in farming; that soon thereafter plaintiff began manifesting and giving expression to an ungovernable temper and showing an

indolent and careless disposition both toward her husband and the defendants, and by a continuous course of conduct from about March 1, 1927, until their final separation on August 7, 1927, without cause; that she would become enraged at, and abusive toward her husband and the defendants, calling them all manner of vile and abusive names and making untrue and unjust accusations about them; was dictatorial and uncongenial in the home and made herself highly obnoxious and disagreeable; was lazy, careless and indifferent about the house; would not work or assist in doing the work which had to be done about the home and on the farm; continually and repeatedly insisted on her and her husband being and staying away from home, thereby neglecting and failing to perform their work and duties on the farm and rendering themselves unfit for doing their necessary work and duties thereon; that plaintiff was dissatisfied with the farm and living thereon, continually and repeatedly insisted on leaving the farm and going to the city and becoming an actress, or obtaining a position away from the farm, and where her husband could not go or live. The answer further alleges:

"And plaintiff was continually and repeatedly unduly familiar with other men, kissed, caressed and took undue liberties with other men, insisting on and being with other men. And plaintiff smoked cigarettes, drank intoxicants, read and discussed salacious and unfit literature, and spent practically all her time along this line. And plaintiff, in an effort to extort a large sum of money from one Frank Wendell, endeavored to get her said husband, Cameron Browning and one Goldie McBride, to agree that said plaintiff would get the said Wendell in a compromising position with plaintiff, in the night time, at a place fixed by plaintiff, and so that plaintiff and the said Wendell could and would be observed by plaintiff's husband, Cameron Browning, and said Goldie McBride, whereupon plaintiff's said husband was to accost said Wendell with a gun and demand hush money in the sum of $5,000; but that her said husband, Cameron Browning, and said Goldie McBride, refused so to do.

"And plaintiff permitted other men to discuss and consider with her, and she considered with them, divorcing her said husband, Cameron Browning, and thereby being in position to go and be with other such men, and to marry whom she desired, and particularly, one Jess Moser.

"And plaintiff continuously and repeatedly submitted herself to the caresses and kisses and other undue familiarities of one Herschel Stoner; and to the caresses of one ———— Harrington, both unmarried men, said conduct generally being carried on in the night time.

"That said acts and conduct of plaintiff were a continuous course of acts and conduct on the part of plaintiff, from about March 1,

1927, to August 7, 1927, and defendants cannot give more definitely the dates and times when they occurred, or the other persons connected therewith other than as above stated."

And that by reason of all her said conduct, her husband could not live with her; and plaintiff and her said husband are separated, and that plaintiff was unwilling to live with her said husband and refused to do so.

The reply was a general denial. The cause was tried to a jury, resulting in the verdict and judgment above indicated. The testimony of the parties is flatly contradictory on practically all material issues in the case. As tending to support the cause of action the testimony is to the effect that when plaintiff and her husband went to the farm to live, they were met at the door by defendant Homer Browning, who told them, "We don't want any kids out here;" said they were there to work; this remark was made in the presence of plaintiff's husband who said nothing; that plaintiff was embarrassed at the remark; that plaintiff was not acquainted with the details of farm work and had no practical experience in the management of a farm home, but immediately began to assist in the care of the house and the farm chores; that plaintiff and her husband were assigned to one room as sleeping quarters; that they ate at the table with Homer Browning and his wife and with them, did the general farm work; that plaintiff arose at about five A. M., and spent each day in household work, caring for the poultry, assisting with the washing and work in the garden, as well as doing other work. There was a large number of cattle and hogs to be fed, a number of milk cows and about 300 chickens to be cared for. That on May 31, 1927, defendant Homer Browning, went to Rochester, Minnesota, for treatment for goitre. After his departure with his wife, plaintiff continued to do work the two women had theretofore done; thus there devolved upon her the duty of keeping the house, caring for the chickens, doing the family washing, preparing the milk for sale and attending to other duties; that up to the time Homer Browning left for Rochester, there was no actual friction between plaintiff and defendants, except the one time when Homer Browning told plaintiff she must have no children.

Shortly after Homer Browning left for Rochester, defendant Frank Browning came out to the farm which, together with the live stock and growing crops, he owned jointly with his son; that Frank Browning immediately commenced a course of criticism of plaintiff; that on one occasion plaintiff, her husband and Frank Browning were seated at the table and plaintiff told her husband the hen-house should be sprayed, as some of the chickens were dying and asked him to purchase some disinfectant; that defendant Frank Browning said "You don't need any disinfectant; it costs too much; you can go to hell

and spray it yourself;'' that plaintiff thereafter cleaned out the hen-house without any assistance from her husband or Frank. Frank Browning continued to stay at the farm, took his meals there and usually walked back to Fairfax to stay all night; that on every opportunity he would make remarks to plaintiff saying how beautiful her shape was and how pretty her legs; that on the afternoon of July 2, 1927, defendant Frank Browning came into the kitchen where plaintiff was peeling potatoes and placed his arms around her with his hands at her breast. She resented this and said so, whereupon Frank told her that people who did not do as he wished did not get to stay there; that he would see that she and Cameron were separated; that thereafter Frank Browning continued to come to the farm until Homer Browning returned from Rochester, but during that period, he never took his meals with plaintiff nor stayed at night at the farm.

Plaintiff testified that at another time she asked her husband to assist her in carrying water for washing purposes from the barn; that Frank Browning interrupted and told her husband he could not spend his lifetime waiting on plaintiff; that he had done too much of that already. Plaintiff's husband stood by and said nothing and plaintiff thereafter carried the water unassisted. Plaintiff testified there was a power washing machine at the farm which she and her mother-in-law had used; that when plaintiff sought to use this machine after Homer Browning and his wife had gone, Frank objected and told her gasoline was too costly; that thereafter a part of the power machine disappeared and plaintiff was compelled to do the washing by means of a tub and washboard.

On another occasion when plaintiff's mother was at the Browning farm assisting plaintiff, defendant Frank Browning refused to allow plaintiff's husband to assist her in carrying water for plaintiff, and also objected to the manner in which plaintiff cared for the cream; that Frank Browning told plaintiff's mother on this occasion that he objected to plaintiff because she could not bake bread and it was too expensive for farmers to buy it; also that the young people were running around too much nights, and that he had put a veto on that and kept them at home; that during the time Homer Browning was in Rochester, defendant Frank Browning went to plaintiff's father and said to him, ''I am going to keep a tight rein on those kids;'' and ''there is a lot of good work in that damned gal, but we can't get it out of her.''

Plaintiff testified that Jane Browning, during this period, spent much time on the farm and continually criticized plaintiff in regard to the shortness of plaintiff's skirts, which were the customary length worn by young women of her age. That on another occasion, defendant Jane Browning took plaintiff's husband to task for bringing

plaintiff a candy bar; wanted plaintiff to do the chores so plaintiff's husband could work longer in the field; that on one occasion when plaintiff's husband came in from the field, Jane Browning took him aside and to task for "taking up for" plaintiff after all they had done for him; that plaintiff heard this conversation through the door; that thereafter plaintiff's husband never "took up" for her again when defendants scolded and criticized her. That on another occasion Jane Browning refused to let plaintiff's husband buy some blueing for her; that Jane Browning raised a disturbance when plaintiff needed a new pair of shoes and suggested she had some old shoes plaintiff could wear. At another time, Jane Browning told an insurance agent that plaintiff's husband had no money to spend for insurance, that he had spent it all on plaintiff. Plaintiff testified that on numerous occasions Jane Browning criticized her, both in and out of the presence of plaintiff's husband, and at no time did he speak a word in her behalf; that on July 10, 1927, when Homer Browning and his wife returned from Rochester, they went to the home of Frank and Jane Browning in Fairfax; that she did not know of their return until late in the same evening; that she called Jane and was told by her that she (plaintiff) could not call at the house until the next day; that the next day, Sunday, plaintiff and her husband went to Fairfax for the purpose of bringing home Homer Browning and his wife. That when she entered the house Homer Browning refused to shake hands with her, saying, "I have been hearing how you have been doing while I was gone. Things will have to be different out there or you have to get out." That her husband was present but uttered no word in her defense; that Frank and Homer Browning then went into another room and talked privately for sometime; that thereafter Homer continued to criticize plaintiff for the way she had kept the house in his absence and her failure to do the chores properly; threatened to whip plaintiff with a buggy whip; that on one of these occasions plaintiff was driven to the necessity of drawing a knife in self protection; that another time plaintiff and a Mrs. Hayden asked plaintiff's husband to aid them in patching a tube of their automobile tire and in the presence of Homer Browning, the husband (referring to his father) said, "The boss won't let me."

At another time, shortly before the final separation, Homer Browning, while seated at the dining table with plaintiff, Mr. and Mrs. Hayden and plaintiff's husband, remarked that Cameron had made a mistake; that he should have married Goldie McBride (a servant girl who worked for wages in the community). He also said, "It is too bad that some people have to marry for money" and to Mrs. Hayden, he said, "Elizabeth is not worth her salt." Plaintiff further testified that Homer Browning told plaintiff she would have to

leave his house by the next Sunday, which was August 7, 1927; that on that day plaintiff and her husband called a neighbor boy and engaged him to take them to Fairfax, Homer Browning refusing to allow his car to be used for that purpose, and stating Cameron could not have the car so long as he remained with plaintiff and could not come back with her; that on the same afternoon plaintiff's husband kissed her good bye, and with three neighbor boys left for Oklahoma, promising her in the presence of her parents that he would send•for her, and stated to them he and plaintiff had never had any trouble between them, and that the trouble was between his folks (defendants) and plaintiff, and that plaintiff had never had a fair deal at the hands of defendants. Plaintiff testified to the circumstances of the return of her husband to Fairfax. There was testimony to the effect that when Cameron returned from Oklahoma, he was at the home of his grandparents, defendants Frank and Jane Browning; that plaintiff's father and mother went there and inquired for Cameron but were told he was not there, but plaintiff's father saw him through a half-open door. Mr. Hulse then was permitted to enter the house and there, for the first time, Cameron declared he had left plaintiff of his own volition. Plaintiff's testimony is further to the effect that there were several other instances in which defendants Frank and Homer Browning attempted to conceal Cameron's whereabouts. These instances are detailed in her testimony. It is also in evidence that Frank Browning on two separate occasions stated he and Homer Browning had been instrumental in bringing about the separation.

The evidence shows that in about a week or ten days after Cameron had gone to Oklahoma, Frank Browning told one Ed Harrington, a resident of Fairfax—''I and Homer thought if we could get this boy down in Oklahoma away from this darned woman, he would amount to something.'' On another occasion, in the presence of one Hugh Moorman, when someone suggested the separation of plaintiff and Cameron, Frank Browning stated: ''Yes, I guess they have, and if he had listened to me, he would have got rid of her a long time ago.'' Plaintiff was corroborated in all material matters by other witnesses. All of plaintiff's testimony was denied by defendants and witnesses were introduced attacking plaintiff's morality, by allegations of specific acts of immorality on her part.

In support of the averments in defendant's answer, evidence was introduced tending to show misconduct of plaintiff which, it is alleged, finally caused to separation from her husband. Defendants' testimony was to the effect that about three weeks after the marriage plaintiff, in anger, slapped her husband on both sides of his face; that shortly thereafter she again slapped him, whereupon he threw her to the floor and spanked her; that on this occasion plaintiff said

to him: "You damned fool, I will show you you can't run over me." That plaintiff's pet names for her husband were "bad case of arrested mentality" and "dirty bum." The testimony in defendants' behalf was to the effect that after the first trouble there were trouble brewing all the time. The following specific instances of plaintiff's misbehavior are mentioned in the evidence in behalf of defendants: that plaintiff asked her husband to kiss her and when he attempted to do so, she bit his lips and pinched his arm; that thereupon he took her down on the brick walk and they had a fight which was stopped by his mother; that one night after they had retired, plaintiff wanted to get up and go to Rockport to a dance and when her husband refused, plaintiff beat him on the back and said: "I wish I had never seen you," to which he replied "Why the hell did you marry me then?" She continued to strike him and he kicked her out of bed onto the floor where she lay for thirty minutes before she returned to bed; that he accidentally bumped her one day in an attempt to retrieve a towell, whereupon she pulled his ear until it bled; that one day Cameron accidentally stepped on a kitten belonging to her; she thought he did it on purpose, and while he was preparing to deliver a load of corn, she climbed upon the wagon and threw ears of corn at him and one struck him and she called him a "son of a bitch;" said she was not afraid of the whole Browning outfit and the sooner they found it out the better; that she called her husband's mother "Minnie" after a negro woman who had been a servant plaintiff's family, saying "let Minnie do all the work." That she refused to press her husband's clothes at one time and when his mother offered to do it, plaintiff locked the clothes in a wardrobe; that one evening plaintiff and her husband went to Tarkio together with Goldie McBride; that plaintiff sat down by one Tillman, threw her arms around his neck and so sat for five minutes; this was in the presence of her husband; that while Homer Browning was in Rochester, plaintiff and her husband went out much at night, staying late and getting up late in the mornings, to the neglect of their agreed duties; that Cameron tried to tell plaintiff how to do her work, but she would get angry; at one time they had a quarrel over going to Big Lake to a dance; at another, a horse being led by Cameron stepped on plaintiff's foot, whereupon she took a switch and struck the horse in the eye which became inflamed and sore, requiring treatment with salt water; at another time plaintiff was beating a sow with a club and then beat her husband with the club; once at the home of a dressmaker, plaintiff slapped her husband in the face and he threw her on the floor and spanked her. On one occasion when they were riding in an automobile, plaintiff took hold of the steering wheel and tried to run the car off an embankment; at one time she became angry because her husband would not take her to Rockport to a

dance; while his parents were at Rochester, Cameron sometimes had to cook his own breakfast and at other times had to eat elsewhere; that plaintiff did not take care of the house; she continually read newspapers and magazines such as Drool Stories, Marriage Secrets, True Story Magazine and the Saturday Evening Post; she never would wash the dishes but piled them in and around the stove and when her husband talked to her about this neglect, she would get "bull-headed" and wouldn't do anything; would not change the linen on the bed, in one instance, not for six weeks; the only washing she did was to take a foot tub and wash her own garments; that on July 4, 1927, a party including plaintiff and her husband went to Rockport and on that occasion, plaintiff sat on the lap of one Herschel Stoner, both going and coming, with her arm around his neck and squeezing him up to her; that she always kissed Stoner good night in the presence of her husband, and at times would get out of the car to do so; that on one occasion plaintiff talked to her husband about Frank Wendell. She wanted to get Mr. Wendell to dance with her at one of the dances in Rockport, lead him on, get him to take her out in his car and then Cameron Browning was to come upon them in a compromising position, with a gun, and plaintiff was to demand $5,000 hush money from him. Plaintiff said "The state of mind that Mr. Wendell's wife is in, he will give this $5,000 cash money rather than for his wife or anybody around here in the community to find it out." Cameron told her if she felt like pulling a stunt like that to go right ahead, but that she could count him out of it. Defendant's witnesses testified plaintiff smoked cigarettes; that she told Cameron before they they were married that she got pretty drunk while in Tarkio College, with Len McCoy, Rose Mellier and Lewis Christian; that she went with one Henry Frieling, both before and after her marriage; that on another occasion plaintiff had been drinking when in company with Frieling and Goldie McBride and became hilarious; that plaintiff danced with one Jess Mozier, usually for a whole evening, and told her husband Mozier was very much in love with her; that the matter of being a vamp and flapper occupied plaintiff's mind; that several times she pulled her dress up and said to her husband, "I believe I would make a chorus girl, don't you?"

The testimony in behalf of defendants tends to show that after Homer Browning returned from Rochester, he reminded plaintiff and her husband of three propositions he had made them, viz.: (1) He would buy forty acres of land and plaintiff and her husband would move thereon, farm the land and have all they could make except taxes; that he would stock the place; (2) they were not to have an automobile until he saw whether they were going to stay there; (3) plaintiff and her husband could stay on the farm where

they were and get one-third of everything, after expenses paid; that plaintiff declined the propositions, saying the land he proposed to buy was "clear out of civilization;" that she did not like the farm and would not live on it; on July 11, 1927, plaintiff applied by letter for a position with the St. Joseph News, describing herself as a girl nineteen years old; that after plaintiff left the Browning home an article in her handwriting was found in the home entitled, "Can a woman hold two jobs at once," in which she expressed the opinion that marriage is a failure and stating she was ready to quit; that shortly before her husband went to Oklahoma he took plaintiff to St. Joseph, giving her $45 to spend; that on this trip plaintiff, her husband and one Gene Rhoads drank intoxicating liquor; that defendants were much opposed to Cameron going to Oklahoma and there was no correspondence between him and defendants while he was there; that after Cameron returned to Fairfax permanently, plaintiff made no attempt to see him nor to communicate with him by telephone, nor even spoke to him on the street; that plaintiff, in the spring of 1928, told one Myrtle King she would never live with her husband again.

In rebuttal plaintiff denied all of the adverse testimony of defendants' witnesses as to her acts of alleged misconduct. Complaint is made that, over defendants' objections, plaintiff and her father and mother were allowed to show several prejudicial statements made to them by Cameron Browning, in the absence of defendants, about what defendants had said to him and his conclusions as to what they had done toward plaintiff. Defendants present these matters as follows:

"He (Cameron Browning) said she (Jane Browning) was angry because I (plaintiff) was not there.

"Why, he (Cameron) said that his grandmother wanted him just to come back.

"She (Jane Browning) said that she wanted him (Cameron) to leave me (plaintiff) at Martin's.

"I (Cameron Browning) know Elizabeth has not had—Elizabeth has not had a fair deal out at the farm.

"Plaintiff had not had a fair deal out there.

"By the Court: Right or wrong I ruled awhile ago.

"That he (Cameron) said that this girl (Elizabeth) had never had a fair deal out there.

"He (Cameron) went ahead to say his grandfather, grandmother and father (all defendants) had not given the girl a fair deal, she had not had a fair chance.

"I (Cameron) am not complaining about Elizabeth, the trouble is not between us.

"Well we (Cameron and plaintiff) can't stay out there any longer, Elizabeth has not had a fair deal out there anyway."

334

Complaint also is made that although plaintiff's reputation or character had not been attacked and was not in issue, plaintiff was permitted to put on the witness stand five witnesses who testified to her good general reputation for chastity, virtue and morality. And the first point urged by appellants is that the court erred in admitting any evidence as to plaintiff's reputation and character because not an issue in the case. Plaintiff contends, of course, that inasmuch as defendants sought to avoid liability by attacking plaintiff's character and reputation and thereby made the same an issue in the case, her evidence on this point was properly admitted. In determining this point, it is necessary to revert to the answer of defendants to the petition. Therein we find liability is sought to be avoided upon the ground that the separation of plaintiff and her husband and their continuing to live apart were caused by the misconduct of plaintiff and the conduct of her said husband, and through no fault or act of the defendants or any of them. The answer pleads specific acts of misconduct, to-wit, that plaintiff was unduly familiar with other men, kissed, caressed and took undue liberties with them; smoked cigarettes, drank intoxicants, read and discussed salacious and unfit literature, proposed a dishonest plan of extorting money from one Frank Wendell, by placing herself in a compromising position with him; repeatedly and continuously submitted to the caresses and kisses and undue familiarities of one Herschel Stoner; and to the caresses of one ———— Harrington, both unmarried men, said conduct generally be carried out in the nighttime. "That said acts and conduct of plaintiff, from about March 1, 1927, to August 7, 1927, were a continous course of conduct," etc. This plea obviously was made for the purpose of showing that by reason of the conduct so pleaded, plaintiff's husband separated from her, and such separation was not due to any acts of defendants. The intent of defendants was clearly to discredit plaintiff. It is the established rule that:

"In civil actions the character of neither party, until assailed, can be inquired into unless it is put in issue by the nature of the proceeding itself. [Citing cases.] It is so put in issue only in that class of cases such as libel, slander, malicious prosecution, etc., in which its value is to be considered in assessing damages." [Vater v. Hultz, 112 Mo. 633.]

A general rule is announced in 30 C. J. 1149, as follows:

"The injured spouse may also recover for the wrong and injury done to his or her feelings, character or reputation." [Citing cases in support of such rule.]

A case in point is that of Bailey v. Bailey, 63 N. W. (Ia.) 341, 343. There, as here, the suit was brought to recover damages for alienation of a husband's affections. The defendants pleaded and at-

tempted to show the separation was brought about by specific acts of immorality on the part of the plaintiff. The court said:

"Defendant offered to show that plaintiff frequently made use of profane and indecent language in the presence of his (defendant's) family, and in the presence of her husband, although not to him; and that she taught her little boy to use vulgar language, but was not permitted to do so. In view of the circumstances attending the marriage of plaintiff to defendant's son, it seems to us that such testimony was competent. If plaintiff was profane and vulgar, if she taught her children the use of indecent language, it might have considerable to do in alienating her husband's affections. Such course of conduct is not calculated to win or hold the affections of a husband. The testimony offered also tends to show the state of domestic happiness in which they had previously lived, and also the character of the plaintiff. It is well settled that plaintiff's character in such an action is in issue. The testimony should have been admitted."

Of like effect is the ruling in Hardwick v. Hardwick, 106 N. W. 639, another Iowa case. These cases being in foreign jurisdictions are not controlling here, but are persuasive. We find, however, the same reasoning in Hartpence v. Rogers, 143 Mo. 633, 45 S. W. 650; Linck v. Vorhauer, 104 Mo. App. 368, 79 S. W. 478. In these cases it was held the disgrace and dishonor cast upon the plaintiff is proper for the consideration of the jury in assessing damages. In such situation, proof of the plaintiff's good character is admissible.

It is noted the record shows the questions propounded to the character witnesses in the case at bar went only to the chastity, virtue and morality of plaintiff, the questions being limited to the phases of plaintiff's character which had been assailed in the answer. The theory of defendants in the trial was that plaintiff's misconduct was the cause of the separation. Therefore we must hold there was no error in the admission of testimony as to plaintiff's good reputation. In Gourley v. Callahan, 190 Mo. App. 666, 670, 176 S. W. 239, a case decided by the St. Louis Court of Appeals, it is said:

"No one can doubt that in civil actions the character of neither party, unless assailed, can be inquired into, if not put in issue in the nature of the proceedings. [See Gutzwiller v. Lackman, 23 Mo. 168.] It is said, too, that the character of a party to a civil suit is only put in issue in the class of cases, such as libel, slander, malicious prosecution, etc., in which evidence of good character is to be considered in assessing damages. [See Black v. Epstein, 221 Mo. 286, 304, 305, 120 S. W. 704; Vawter v. Hultz, 112 Mo. 633, 639, 20 S. W. 689.] If, however, in the trial of a civil suit where the character of a party is not in question by the nature of the proceedings, the adverse party raises the issue in respect of it by assaulting the char-

acter of his adversary, it then becomes competent for such party so attacked to bring forward character witnesses to sustain his good repute." [See also Reynolds v. Davis, 303 418, 439, 260 S. W. 994; Pioneer, etc., Co. v. Goodman, 201 S. W. 576, 578; Davenport v. Silvet, 265 Mo. 543, 178 S. W. 168; State v. Richards, 11 S. W. (2d) 1035; State v. Maggard, 250 Mo. 335, 157 S. W. 354.]

Defendants stress the ruling in the case of Orris v. Railroad, 279 Mo. 1, l. c. 18, 214 S. W. 154, but we note a distinction between that case and the one at bar. In the cited case there had been contradictory statements by one of the witnesses. The court held that a cross examination of the witness on these contradictory statements was an attack on his credibility as a witness and not an attack on his general reputation. We rule against defendants on this point, and this ruling we hold not to be contrary to our ruling in Haley v. Walker, 12 S. W. (2d) 759. Other citations of defendants we hold not to be controlling on this point.

Directing their arguments to the same point, but from a different angle, defendants insist plaintiff's character was not an issue in the case, but it is evident, from what has been said herein, there is no merit in this contention. Plaintiff's character was made an issue both by the answer and defendants' cross-examination of plaintiff and her witnesses in regard to the specific acts of immorality charged. [Costello v. Kansas City et al., 280 Mo. 576, 590, 219 S. W. 386; McCoy v. Hill, 246 S. W. 582; Davenport v. Silvey, 265 Mo. 543, 178 S. W. 168.]

It is urged there was no conspiracy proved and therefore evidence of independent separate acts of defendants was improper. Conspiracy is defined as "a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." [1 Bouvier's Law Dict. 621, and cases cited.] Defendants argue that before plaintiff may be entitled to recover she must first actually prove that a conspiracy existed. The general rule in this respect is stated in 12 C. J. 638, sec. 231, as follows:

"Although the fraudulent and corrupt combination, the common design, is the essential element, it is not necessary to prove that defendants came together and actually agreed in terms to have this common design and to pursue it by common means and so carry it into execution. Such proof can seldom be made and therefore is not required. It is sufficient to justify the jury in finding a conspiracy if it is shown that the persons charged with conspiring pursued by their acts the same object, often by the same means, one performings one part of an act and the other another part of the

same act, so as to complete it, with a view to the attainment of the object which they were pursuing.''

This rule has been followed in Missouri in State ex rel. v. Ice, etc., Co., 246 Mo. 168, 151 S. W. 101; Allen v. Forsythe, 160 Mo. App. 262, 142 S. W. 820; Mosby v. Com. Co., 91 Mo. App. 500. The rule is tersely stated in State v. Stamper (Mo.), 285 S. W. 437, where it is said: .

''A conspiracy may be proven by circumstances. It is not necessary to prove that parties who engage in a common enterprise to commit a crime, made a definite agreement between them before committing the crime.'' ·

[See also Dietrich v. Ice, etc., Co. (Mo.), 286 S. W. 36; Rice v. Gray et al., 34 S. W. (2d) 567, 572.] In a conspiracy, the act of one conspirator is the act of all. The petition herein alleges all the defendants induced plaintiff's husband to leave her; and that they deprived her of his aid, companionship and society. Therefore evidence of the separate acts of each was properly received. Our attention is called to no cases holding to the contrary.

Plaintiff's evidence that defendants and each of them sought the separation of plaintiff and her husband was sufficiently substantial to take the case to the jury and to sustain a verdict against all of the defendants, if the jury believed the separate acts of each, as shown by the testimony, were directed to the same end. Hence defendants' charge that it was error to render one judgment against all the defendants is without merit.

It is urged the court erred in permitting the introduction in evidence of statements made by plaintiff's husband to her and her parents, respecting his mental attitude; that these statements were made out of the hearing of defendants and should be regarded as hearsay. This charge is without merit. The record discloses this evidence was received for the sole purpose of reflecting the mental attitude of plaintiff's husband and was so restricted by plaintiff's instruction No. 7, and was properly admitted. [Fuller v. Robinson, 230 Mo. 22, 39, 40, 130 S. W. 343; McGinnis v. McGlothlan, 192 Mo. App. 141, 180 S. W. 405.] In Bryson v. Baum, 278 S. W. 412, 413, the Supreme Court said:

''However, the law applicable to the case now before us is fully discussed in Fuller v. Robinson, 230 Mo. 22, l. c. 42, 130 S. W. 343, Ann. Cas. 1912A, 938, wherein it was held that such evidence is clearly competent under the exception to the hearsay rule for the purpose of showing the feelings or mental condition of the plaintiff's wife. The exception is thus stated in Greenleaf on Evidence (16 Ed.), sec. 162d:

'' 'In actions for criminal conversation, it being material to ascertain upon what terms the husband and wife lived together before

the seduction (or in any other case in which the feelings of either toward the other is material), their language and deportment towards each other, their correspondence together, and their conversations and correspondence with third persons, are original evidence.'

"This line of testimony, admitted over plaintiff's objections, comes within the exception stated."

And in Wagner v. Wagner, 215 S. W. 784, it is said:

"We rule that the conversation with plaintiff's husband was properly admitted as tending to show the husband's mental attitude and the state of his feelings toward his wife." [See also Allen v. Forsythe, supra; Hellinghausen v. Ade (Mo. Sup.), 233 S. W. 39; Nelson v. Nelson, 296 Fed. 369; Hope v. Twarling, 198 N. W. (Neb.) 161.]

It is charged the giving of plaintiff's instruction "B" was error, in that it assume certain controverted issues of fact, to-wit:

"If it had not been for the wrongful and malicious acts and conduct and influence of said defendants toward him," the charge being that the language assumes the wrongful and malicious acts of defendants caused the separation. Instruction "B" tells the jury that even though the conduct of plaintiff's husband toward her afforded her sufficient grounds for divorce; yet, notwithstanding this, plaintiff was willing to live with him and that he would not have separated from her "if it had not been for the wilful and malicious acts and conduct and influence of said defendants toward him, and that said defendants wilfully and maliciously, by such acts and conduct and influence, induced, enticed and caused him to separate and remain apart from plaintiff, then the fact of the misconduct of plaintiff's husband toward her does not of itself constitute any defense of this suit."

Instruction "B" taken alone might be subject to the criticism directed against it, but is not open to such criticism when taken in connection with plaintiff's instruction "A" which immediately precedes it and submits for the determination of the jury the matter now objected to. Instruction "A" reads as follows:

"The court instructs the jury that a wife is entitled to the society, companionship, comfort, protection and aid of her husband. The law gives her a right of action against any person who willfully and maliciously entices, persuades, induces or influences her husband to separate or remain apart from her. Therefore, if you believe from the evidence that the defendants willfully and maliciously acted in concert, or cooperated together, with the purpose and intent to cause the separation of the plaintiff's husband from her, and to cause him to remain apart from her, and that they did thereby accomplish such purpose and intent, then your verdict should be for the plaintiff."

The two instructions should be read together, and the matter complained of having been once submitted to the jury, it was not error

to assume its existence thereafter, as it will be presumed the jury had already determined the matter in favor of plaintiff when it reached plaintiff's instruction "B."

A charge of error is also directed against plaintiff's instruction "C," in that it tells the jury that if defendants were guilty of such conduct as was calculated to prejudice plaintiff's husband against her and to alienate him from her and induce him to leave her and remain apart from her, and such effect was intended to be produced by defendants, then the jury should find for plaintiff. It is charged the instruction directs a verdict and is in conflict with instruction No. 3, given for defendants; that it omits—

"The element of wrongful and malicious conduct on the part of the defendants, does not recognize the right which the law gives to the parent, in this—that the law presumes that counsel and advice given by a parent to a child is given in good faith, from proper motives and honest impulses."

There is no merit in this contention. Defendants' instruction No. 3 presents the question of parental counsel and advice. [Hartpence v. Rogers, 143 Mo. 623, l. c. 633; Modisett v. McPike, supra; Bryson v. Baum, supra; BeFord v. Johnson, 251 Mo. 244, 255.]

Plaintiff's instruction "D" is attacked on the ground that it erroneously tells the jury "that it is not necessary for all the defendants to have previously conspired or confederated to bring about the separation." From what we have already said, this instruction correctly declares the law and is not error. It does not conflict with defendants' instruction No. 6, as charged. [Belt v. Belt, supra; Hostetter v. Green, 150 Ky. 551, 150 S. W. 652.]

Finally, it is urged the court erred in refusing defendants' Instructions 10 and 11. The vice of these instructions is patent on the face of each. Part of instruction No. 10, is as follows:

"Although the jury may believe that Homer Browning did require the plaintiff to leave his home, still such fact alone would not warrant the jury in finding a verdict for the plaintiff."

And instruction No. 11, is to the same effect, as follows:

"Although you may believe from the evidence that the defendant, Homer Browning, did require the plaintiff to leave his home, still such fact alone will not warrant you in finding a verdict for plaintiff."

The record discloses that plaintiff did not at any time contend she was seeking to recover for this specific act of Homer Browning, But for a long period of alleged mistreatment by defendants. These instructions erroneously single out one of the defendants, and thus gave undue prominence thereto. It was held in Porter v. Porter (a case decided by the St. Louis Court of Appeals), 258 S. W. 76:

". . . if the parent is guilty of such conduct as tends to cause

the separation of the husband from the wife, so as to be without just cause or excuse so that malice is inferred, it breaks down the barrier of privilege so as to create a cause of action against the parent.''

[See also Barton v. Barton, 119 Mo. App. 507, 94 S. W. 974; Nichols v. Nichols, 147 Mo. 387, 48 S. W. 947.] The record discloses there was substantial evidence from which the jury might well conclude Homer Browning, by his course of conduct, had forfeited his right of counselling and advising his son. We fail to find reversible error of record and the judgment is accordingly affirmed. *Bland, J.,* concurs; *Trimble, P. J.,* absent.